**COMPETITIVE ASSOCIATES, INC.,**
**Plaintiff-Appellant,**

**v.**

**LAVENTHOL, KREKSTEIN, HOR-**
**WATH & HORWATH, et al.,**
**Defendants-Appellees.**

**No. 456, Docket 74–2048.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 10, 1975.

Decided May 8, 1975.

812

Michael C. Devine, New York City (Butowsky, Schwenke & Devine, New York City, on the brief), for plaintiff-appellant.

Stephen W. Greiner, New York City (Willkie, Farr & Gallagher, New York City, on the brief, Louis A. Craco and

Richard L. Feller, New York City, of counsel), for defendants-appellees.

Before HAYS and FEINBERG, Circuit Judges, and HOLDEN,* District Judge.

HAYS, Circuit Judge:

This is an appeal by plaintiff Competitive Associates, a publicly held mutual fund, from summary judgment entered on July 3, 1974, in the United States District Court for the Southern District of New York, in favor of defendants Laventhol, Krekstein, Horwath and Horwath, an accounting firm, and Morton Dear, Robert E. Bier, and Thomas Martino, Jr., three individual employees of that firm.[1] The action is based variously on section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), SEC Rule 10b–5, section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, sections 206(1) and 206(2) of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b–6(1) and 80b–6(2), common law fraud and breach of fiduciary duty.[2] Plaintiff alleges that defendants, in furtherance of a fraudulent scheme to induce plaintiff to retain one Akiyoshi Yamada and his company, Takara Asset Management Corporation, to manage a portion of its portfolio, knowingly certified false and misleading financial statements of Takara Partners, a private investment fund managed by Yamada. As a result, plaintiff avers, it subsequently lost several million dollars from purchases and sales of securities which Yamada in his capacity as adviser, unlawfully

---

* Chief Judge of the United States District Court for the District of Vermont, sitting by designation.

1. The opinion and order of the district court is reported at CCH [1973–1974 Transfer Binder] Fed.Sec.L.Rep. ¶ 94,617 (S.D.N.Y.1974).

2. In their briefs both parties have focused upon the claims asserted under section 10(b) and Rule 10b–5. Rule 10b–5, provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

17 C.F.R. § 240.10b–5.

caused it to make.[3] Specifically, plaintiff contends that the investment performance of Takara Partners was generally regarded as the primary measure of Yamada's expertise as an investment adviser, that the statements for the period ended December 31, 1969, certified by Laventhol, Krekstein, were materially false and misleading with respect to the size and quality of the partnership's assets and its profit and loss performance, that Laventhol, Krekstein knowingly and with intent to defraud certified these statements in order to facilitate, aid and abet Yamada's scheme to attract a showcase of investors to Takara, inflate his reputation as a successful investment adviser, and thereby create a dumping ground for securities which he was manipulating. An examination of the record convinces us that under the circumstances of this case, summary judgment was inappropriate; we therefore reverse and remand for trial.

## I.

Competitive Associates retained defendant Yamada and his company Takara Asset Management Corporation as one of its portfolio managers on October 9, 1970. Prior to his retention, Yamada's credentials were investigated by Competitive Associates. Jerome Randolph, then president of Competitive Capital, the fund manager for Competitive Associates,[4] was responsible for conducting the investigation. In the course of his investigation, Randolph interviewed various people in the securities industry. In addition he received a letter from Yamada dated June 12, 1970, which included a list of Takara's general and limited partners, and set forth certain financial information concerning Takara Partners, although it did not refer to the financial statements audited by the accounting defendants. Randolph also examined "portfolio sheets" for Takara Partners consisting of lists of stocks owned and their respective market values. Randolph prepared a summary description of Yamada and the funds he was then managing[5] together with a description of other potential portfolio managers for Competitive Associates and presented this material to its Board of Directors who thereupon approved Yamada as one of the portfolio managers. This choice was subsequently ratified by the shareholders of Competitive Associates. Yamada served as adviser until May 14, 1971, at which time his contract was terminated. During this period, Competitive Associates suffered substantial losses as a result of purchases and sales of securities made by Yamada on its behalf.

The district court granted defendants' motion for summary judgment on the theory that proof of direct reliance on the financial statements of Takara was an indispensable element of plaintiff's cause of action. Relying on excerpts from testimony given by Randolph before the SEC on May 10, 1971,[6] asserting that he, Randolph, had not seen the Takara financial statements prior to that date, the admissibility of which evidence plaintiff vigorously contests, the court concluded that plaintiff would be unable to prove the necessary reliance at trial. The court further held that even if the Takara financial statements did constitute an inducement to plaintiff to hire Yamada as its investment adviser, the

---

3. The action is still pending in the district court against Yamada, his company, Takara Asset Management Corporation, and his attorney, Ira M. Smith.

4. The fund manager did not make the investment decisions for the fund. These decisions were made by independent portfolio managers, who were retained by means of a three-party agreement with the fund and the fund manager.

Randolph was the president of Competitive Capital from June 25, 1970 to June 30, 1972

and a member of its board of directors from April 14, 1971 to June 30, 1972. Randolph was also president and chairman of the board of directors of Competitive Associates from October 9, 1970 to June 30, 1972.

5. In addition to Takara Partners, Yamada managed an off-shore fund, Armstrong Investors.

6. Randolph was not within the control of Competitive Associates at the time of the summary judgment motion and has not been deposed by either side in connection with this action.

connection between the fraudulent acts and omissions of the accounting defendants and the purchase or sale of securities which is required to support a claim under the federal securities laws was lacking. We disagree.

## II.

As a matter of law, the district court erred in its determination that plaintiff could not prevail unless it could prove direct reliance on the false financial statements certified by defendants. The Supreme Court specifically rejected such a restrictive reading of section 10(b) and Rule 10b–5 in Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). In that case, members of a large class of stockholders alleged that two employees of a bank in which their shares were deposited had, contrary to Rule 10b–5, arranged for sales of this stock without disclosing to plaintiffs facts regarding the role of the bank and its employees as "market makers" or the true value of the stock. In reversing the Court of Appeals, which had held that section 10(b) and Rule 10b–5 necessitated a showing of reliance for recovery, the Supreme Court stated that

> "[u]nder the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. (Citations omitted.) This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact." 406 U.S. at 153–54, 92 S.Ct. at 1472.

This Court has also expressed the view that a plaintiff need not prove that non-disclosure of material facts induced its purchases, but need only allege that it would not have acted as it did had it known of the information withheld by defendants. Shapiro v. Merrill, Lynch, Pierce, Fenner and Smith, Inc., 495 F.2d 228, 240 (2d Cir. 1974). "To the extent that reliance is necessary for a finding of a 10b–5 violation in a non-disclosure case . . ., the test is properly one of tort 'causation in fact.'" Id. at 239, quoting Chasins v. Smith, Barney & Co., 438 F.2d 1167, 1172 (2d Cir. 1970).

Defendants, relying on a distinction set forth in dicta in Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374 (2d Cir. 1974), submit that the instant case involves allegations of misrepresentation as opposed to nondisclosure and that therefore plaintiff must show reliance in addition to causation in fact. However, as this court made quite clear in the Schlick case in which the district court's dismissal of plaintiff's complaint was reversed, a showing of reliance is not required where a comprehensive scheme to defraud which includes not only omissions and misrepresentation, but substantial collateral conduct as well, is alleged. 507 F.2d at 380–81. Not every violation of the anti-fraud provisions of the federal securities law can be, or should be, forced into a category headed "misrepresentations" or "nondisclosures". Fraudulent devices, practices, schemes, artifices and courses of business are also interdicted by the securities laws. In the case before us, plaintiff has charged the accounting defendants not only with affirmative misrepresentations in the financial statements, but also with a failure to disclose the true financial condition of Takara Partners and the alleged receipt of payoffs in return for its certification; furthermore, both misrepresentations and omissions are alleged to be only one aspect of an elaborate scheme to defraud. Under these circumstances, plaintiff need only show causation in fact; in order to do so plaintiff should have the opportunity to prove, but is not required to prove, that it saw, or directly relied upon, the financial statements certified by the accounting defendants. Cf. Hochfelder v. Ernst & Ernst, 503 F.2d 1100, 1115 (7th Cir. 1974).

### III.

The finding of the district court that the auditing and certification activities of defendants was not conduct "in connection with the purchase or sale" of a security involving plaintiffs within the meaning of section 10(b) and Rule 10b–5 is error. The "in connection with" requirement has been broadly interpreted by the Supreme Court to require only that plaintiff shall have "suffered an injury as a result of deceptive practices touching its sale of securities as an investor." Superintendent of Insurance v. Bankers Life and Casualty Co., 404 U.S. 6, 12–13, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). The broad "touch" test enunciated in *Bankers Life* is certainly met by plaintiff's allegations that the very purpose of defendants' certification of Takara's financial statement was to aid in placing Yamada in a position where he could manipulate securities prices and sell these securities to investors attracted by Yamada's reputation and performance.

Defendants attempt to characterize the purchases and sales of securities before us here as fortuitous transactions unrelated to their auditing and certification of the Takara Partners' financial statements. They rely upon a number of cases relieving accountants from liability on the ground that the "in connection with" requirement was not satisfied. We find these cases to be inapposite. In each case, the court premised the result on a finding that the accountants involved did not know or expect their reports to be relied upon by anyone other than the members of the entity for which the reports were specifically prepared and therefore were not reasonably calculated to influence the investing public. See e. g., Landy v. FDIC, 486 F.2d 139, 168 (3d Cir. 1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); Wessel v. Buhler, 437 F.2d 279, 282 (9th Cir. 1971); Cf. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 862 (2d Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). In contrast, plaintiff here alleges that the accountants accepted payoffs and otherwise actively collaborated with Yamada for the specific purpose of influencing investors to authorize Yamada to carry out security transactions on its behalf. As we have made clear on a previous occasion:

"[We do not] think it sound to dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is 'usually associated with the sale or purchase of securities.' We believe that § 10(b) and Rule 10b–5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involved a garden type variety of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws." A. T. Brod and Co. v. Perlow, 375 F.2d 393, 397 (2d Cir. 1967), quoted in Superintendent of Insurance v. Bankers Life and Casualty Co., 404 U.S. at 11, n. 7, 92 S.Ct. 165.

Plaintiff has alleged a fraudulent scheme the accomplishment of which is directly related to the trading process. We think that the district court was premature in denying it an opportunity to prove its claims. The record before us gives rise to conflicting inferences of active fraudulent conduct on the part of defendant accountants which should be resolved at trial rather than on a motion for summary judgment. Accordingly, the judgment of the district court is reversed and we remand for trial.