COMPETITIVE ASSOCIATES, INC., Plaintiff,

v.

LAVENTHOL KREKSTEIN HORWATH & HORWATH, Morton Dear, Robert E. Bier, and Thomas Martino, Jr., Defendants.

No. 72 Civ. 1986.

United States District Court, S. D. New York.

Oct. 18, 1979.

Michael C. Devine, Schwenke & Devine, S. Pitkin Marshall, Stults, Marshall & Gabler, New York City, for plaintiff.

Louis A. Craco, Willkie, Farr & Gallagher, Stephen Greiner, Anne D. Lopatto, New York City, for Laventhol Krekstein Horwath.

Arthur H. Christy, Christy & Viener, Arthur Nealon, New York City, for Morton Dear, Robert E. Bier and Thomas Martino, Jr.

## OPINION

GRIESA, District Judge.

This is an action under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and S.E.C. Rule 10b–5.[1] Plaintiff Competitive Associates, Inc. was formerly a publicly held mutual fund. In October 1970 Competitive retained Akiyoshi Yamada and his company, Takara Asset Management Corporation, to manage a portion of Competitive's portfolio. It was later revealed that Yamada was heavily involved in stock manipulation schemes. Competitive asserts in this action that it was defrauded into hiring Yamada and that Yamada caused several million dollars in losses to Competitive during the time of Yamada's employment.

The case has gone to trial against four defendants—the accounting firm of Laventhol Krekstein Horwath & Horwath ("LKH"), and three accountants formerly associated with that firm—Morton Dear, Robert E. Bier, and Thomas Martino, Jr.[2] LKH audited the financial statement of an entity called Takara Partners for the period July 16, 1969 through December 31, 1969. Takara Partners was a small private investment fund, managed by Yamada and his associate John Peter Galanis. The complaint in this action alleges that the financial statement of Takara Partners was false and misleading and that Competitive received and relied upon this false financial statement in hiring Yamada.

At an earlier stage of this litigation the action was dismissed as to LKH and the three individual accountants on a motion for summary judgment, because the submissions on the motion showed conclusively that Competitive neither received nor relied upon the 1969 financial statement of Takara Partners. Competitive appealed, and asserted a new theory on appeal, that, even if Competitive may not have received the Takara Partners financial statement, nevertheless the accounting defendants were liable, because they deliberately participated with Yamada in a scheme to inflate his reputation as a successful investment adviser so that he could obtain "dumping grounds"—such as Competitive—for his manipulated securities. The Court of Appeals reversed the summary judgment. *Competitive Associates, Inc. v. Laventhol Krekstein Horwath & Horwath*, 516 F.2d 811 (2d Cir. 1975). The Court of Appeals characterized the triable claim of Competitive as follows (p. 815):

".  .  . plaintiff's allegations that the very purpose of defendants' certification of Takara's financial statement was to aid in placing Yamada in a position where he could manipulate securities prices and sell these securities to investors attracted by Yamada's reputation and performance."

The case against the accounting defendants has been tried to the Court without a jury. This opinion constitutes the Court's findings of fact and conclusions of law.

## I.

Takara Partners commenced operations July 16, 1969. It was a limited partnership, with 25 limited partners, who made investments of $100,000 or more each. The list of limited partners included a number of persons prominent in the financial community. The total capital contributed was about $2.8 million. The fund was managed by Akiyoshi Yamada and John Peter Galanis, who were the general partners. Both Yamada

---

1. The complaint refers to other federal statutes and to common law theories. However, the parties have submitted the case solely under Section 10(b) and Rule 10b–5.

2. The complaint originally named other defendants—Akiyoshi Yamada, Ira N. Smith, and Takara Asset Management Corporation. The action has been discontinued against Yamada and Smith. Takara Asset Management Corporation was never served. A second plaintiff originally named in the complaint—Competitive Capital Corporation—has been dropped from the case.

and Galanis had acquired reputations as talented money managers. Yamada had been with Kuhn Loeb & Co. from 1965 to 1969 and had risen rapidly in that firm. Galanis had been with Merrill Lynch Pierce Fenner & Smith and had also been associated with mutual funds thought to be highly successful.

Unknown to the Takara Partners investors and obviously unknown to the investment community in general, Yamada and Galanis were deeply involved in stock manipulation schemes. Their handling of Takara Partners was disastrous. Among other things, substantial funds were invested in manipulated stocks.

During the first months of the existence of Takara Partners, Yamada and Galanis gave assurances to the limited partners that the assets were growing. The opposite was true. When the end of the year 1969 was approaching, Yamada and Galanis were faced with the necessity of having an audited financial statement prepared. Obviously they desired to conceal the facts. They set out to retain accountants who would be as cooperative as possible, and they determined upon a course of deceiving the accountants, while at the same time gaining their good will by means of stock tips on new issues and help in obtaining additional accounting clients.

Upon the recommendation of Galanis, LKH was retained by Takara Partners in December 1969. Dear was the partner in LKH in charge of the audit. Bier and Martino were employees of the firm. Bier was the senior accountant working under Dear. Martino was a staff accountant under Bier. A second staff accountant—Michael J. Weiner—worked on the audit, but is not a defendant in the action.

LKH certified the 1969 financial statement of Takara Partners under date of March 23, 1970. The statement showed that the $2,817,641 partners' equity contributed had grown to $3,269,984 as of December 31, 1969. The value of the marketable and restricted securities was shown as $3,287,544, compared with their cost, shown as $3,029,036. Another major item in the balance sheet was "Put Options Available" shown as having a value of $410,375.

For reasons which will be described subsequently, the 1969 financial statement of Takara Partners was prepared in both a long form and a short form. The long form included a section entitled "Accountants' Report on Supplementary Information." This supplementary information contained lists of the marketable securities and restricted securities, as well as the securities involved in the put options. The short form statement did not include the supplementary information and thus did not include the lists of the specific securities in the Takara Partners portfolio.

It is conceded that the financial statement was materially false. The falsity lay in the drastic overvaluation of restricted securities (i. e., securities not publicly traded) and in the fact that the put options were entirely fictitious.

By way of background, it should be noted that the marketable securities were comprised of 28 common stocks and 2 convertible debentures, which had a cost of $1,560,536, and which had a market value on December 31, 1969 of $1,194,525. Thus there was an unrealized loss in the marketable securities of $366,011. There is no contention that the information regarding the marketable securities was false. Of course, it was this unrealized loss in the marketable securities which made Yamada and Galanis feel the necessity for falsification regarding the restricted securities and the put options in order to create an appearance of growth in the assets of Takara Partners.

Takara Partners owned restricted securities in seven companies as follows:
Academic Development Corporation
Computer Tools
Delanair, Inc.
Devon International, Inc.
International Computer Products
Medequip Corporation
Science Systems and Technology
In the case of Delanair, Takara Partners owned both stock and warrants. In the case of the other six companies, Takara owned stock.

The long form financial statement listed the total cost for the restricted securities as $1,468,500 and listed the "Appraisal Value" of these securities as of December 31, 1969 as $2,093,019, producing an unrealized appreciation of $624,519. In the case of two of the restricted securities, Academic Development and Science Systems—the appraisal value was the same as the cost. In the case of Delanair common stock, the appraisal value was less than the cost. In the case of all other restricted securities, gains were shown. The most spectacular reported gain related to Devon—from a cost of $13,500 to an appraisal value of $371,250.

The Takara Partners partnership agreement required that restricted securities be appraised by an investment banker at the time of the annual audit, and Yamada and Galanis obtained what purported to be such appraisals for the 1969 audit. However, it is conceded that the appraisal values were largely fabricated. In the case of Science Systems the appraisal was forged, and in the case of International Computer Products the appraisal was procured by a bribe. The appraisals for Academic Development, Computer Tools, Medequip, and Devon were procured from persons collaborating with Yamada and Galanis in their illegal enterprises. Only the Delanair appraisal appears to have been bona fide. The value of the restricted securities as of December 31, 1969 was far less than the reported $2,193,019.

The fictitious put options arose because Yamada and Galanis felt the need for an additional fraudulent device for inflating the 1969 figures for Takara Partners. Also, one Morton Kaplan had loaned $240,000 to Takara Partners in the fall of 1969, and Yamada and Galanis desired to conceal this loan. Galanis devised the idea of creating fictional put options, in which Takara Partners appeared to have the right to put certain stocks to Kaplan's company, Micro Thermal Applications. The fictional option prices were high enough to create a substantial value in the options, and the $240,000 could be explained as a down payment against Micro Thermal's obligation under the option agreements.

The long form financial statement listed put options for three companies—Brilund Mines, Computer Studies, and Planet Oil and Mineral. The information about the options, as given in the financial statement, was as follows:

| Number of Shares | Security | Expire | Option Price | Market Value of Security | Market Value of Put Options Available |
|---|---|---|---|---|---|
| 5,000 | Brilund Mines | 3/31/70 | $410,000 | $146,875 | $263,125 |
| 10,000 | Computer Studies | 6/30/70 | 120,000 | 88,750 | 31,250 |
| 2,000 | Planet Oil and Mineral | 3/31/70 | 164,000 | 48,000 | 116,000 |
| | | | $694,000 | $283,625 | $410,375 |

The "Market Value of Security" was as of December 31, 1969.

Documents purporting to be put option agreements had been signed by Galanis on behalf of Takara Partners and by Kaplan on behalf of Micro Thermal. The dates of the purported option agreements were:

| Brilund Mines | 9/15/69 |
| Computer Studies | 9/10/69 |
| Planet Oil and Mineral | 9/10/69 |

However, the option agreements were entirely fictitious. Kaplan was an accomplice in the fraud of Galanis and Yamada.

## II.

It is now necessary to set forth the facts on the question of what the accountants did and did not do in the Takara Partners audit—particularly in reference to the restricted securities and the put options.

Amendment No. 1 to the Limited Partnership Agreement of Takara Partners provided as follows:

"FIRST: VALUATION OF INVESTMENT LETTER SECURITIES. All investment letter securities shall be ap-

praised annually as of the end of each fiscal year of the partnership for the purposes of determining the value of such investment letter securities. The appraisal of investment letter securities shall be made by an independent investment banker selected by the General Partner and the determination of the value of such investment letter securities by the independent investment banker so selected shall be final and conclusive." [3]

The LKH Audit Program for the Takara Partners audit, prepared by senior accountant Bier, provided in part as follows:

"Securities in position—gains & losses
From broker confirmations, compare position
Examine securities held & private placement contracts
Compare market prices with independent source or with appraisal letters in client's possession"

Defendants argue that their audit obligation regarding the restricted securities was solely to ascertain that appraisals by investment bankers had been obtained in accordance with the partnership agreement. Competitive argues that the circumstances of the various appraisals cast doubt on whether they were bona fide appraisals by independent investment bankers, and that, in any event, the accountants had a duty to obtain information about the restricted securities other than the appraisals, including market prices for those companies which had publicly traded stock. Competitive interprets the audit program as requiring a comparison of the appraisal values with market prices where available.

There is an accounting work paper dated March 16, 1970, prepared by Bier, and approved by the LKH partner, Dear, which summarizes the figures for the restricted securities. The accounting work papers also contain certain letters and telegrams purporting to be the appraisals of the restricted securities. These are as follows:

A. Letter dated February 10, 1970 from James W. Feeney of D'Onofrio, Feeney, Kirschbaum & Co., Inc., New York City, addressed to Galanis, appraising the 100,000 shares of Academic Development at $4.00 per share, or at a total value of $400,000, and stating that the company was in the process of preparing a registration statement to enable Takara to register these shares, and further stating that there had been no material adverse change in the value of the stock since Takara's purchase in October 1969.

B. Telegram dated March 26, 1970 from Arnold Wilkens & Co., New York City, to LKH, confirming letter of February 3, 1970 to Galanis, valuing 11,112 shares of Medequip at $10 per share, or a total of $111,120, and valuing 16,667 shares of Computer Tools at $5.00 per share, or $83,335. The February 3 letter is not in the accounting work papers, and there is no evidence that the accountants saw such a letter.

C. Letter (undated) from J. Morton Davis of D. H. Blair & Co., New York City, to Yamada appraising the 100,000 shares of Delanair stock as of December 31, 1969 at $2.76 per share or a total of $276,000; and the 100,000 warrants at $2.25 per warrant, or a total of $225,000. The letter states that on December 31, 1969 the high bid and low asked quotes for Delanair, reported in the "Pink Sheets" were both $3.25, and that the appraisal of the stock is 85% of this figure. The letter states that a relatively small discount was used because of the imminent registration of the stock for public sale. The letter states that the warrants give Takara a four-year call on Delanair stock at $1.00 per share, and the appraisal of the warrants is based upon the difference between the $3.25 low price as of December 31, 1969 on the traded stock and the $1.00 call price—this difference being $2.25. D. H. Blair confirmed these appraisals directly to LKH in a telegram dated March 26, 1970, contained in the accounting work papers.

D. Telegram dated March 30, 1970 from Perry Constantinou of Provident

---

3. Investment letter securities are restricted securities.

Securities, New York City, appraising 135,000 shares of Devon International at $2.75 per share, or a total of $371,250. The telegram refers to an earlier letter to Takara Partners, but no such letter is contained in the accounting work papers.

E. Letter dated February 13, 1970 from William C. Kennedy, Jr., of Ling & Company, Inc., Dallas, Texas, to Yamada appraising the 70,175 shares of International Computer Products as of December 31, 1969 at $4.65 per share, or a total of $326,314. The letter notes that the shares are unregistered, but states that Ling & Company has given a letter of intent to underwrite the shares at $11.50 per share; and that the company is obligated to file the registration statement on or before March 31, 1970. This appraisal was confirmed in a telegram from Ling & Company to LKH dated March 24, 1970, contained in the accounting work papers.

F. Letter (undated) from George Van Aiken of Baerwold & DeBoer, New York City, appraising the 100,000 shares of Science Systems and Technology at $3.00 per share, or a total of $300,000.

There is no evidence that the accountants had any knowledge of the forgery of the Science Systems appraisal, or the bribe involved in procuring the International Computer Products appraisal. There is no evidence that the accountants had any knowledge about the nature of the collaboration involved in obtaining the appraisals for Academic Development, Computer Tools and Medequip. There is testimony by Yamada that he discussed Devon International with Dear and Bier in December 1969 and spoke in terms indicating that the registration and public sale of Devon stock in early 1970 would be a manipulation. This and other similar testimony by Yamada cannot be credited. I find that the accountants did not know of the manipulations of Yamada and Galanis with regard to Devon or any other stocks. As to the appraisal of Takara's Devon International restricted stock, I find that the accountants had no knowledge that the appraisal was obtained from a fraudulent collaborator.

As already noted, one of Competitive's contentions is that the accountants willfully failed to verify the appraisals of the restricted securities by a comparison with the market prices of publicly traded shares in the same companies (found in the so-called "pink sheets").

The evidence indicates that, as of December 31, 1969, there was public trading in stock of Academic Development, Computer Tools, Medequip, and Delanair, and that "pink sheets" were available showing the trading quotations of the publicly traded stock in these companies. It appears also that public trading in stock of Devon International began sometime in January 1970, and that pink sheets were available for this company beginning at that time. There was no trading in the stock of Science Systems and Technology as of December 31, 1969 or thereafter, because this was a defunct corporation. There was no public trading at any relevant time in shares of International Computer Products.

The LKH accountants did not request or obtain pink sheets for any of the restricted stock companies. Bier has testified that he was given a notation containing pink sheet quotations of Devon International indicating a market value of the publicly traded stock in that company of $9.00 or $10.00 a share. His testimony is that, in view of this information, the appraisal value of $2.75 per share for Devon International appeared conservative. The D. H. Blair letter regarding Delanair refers to pink sheet quotations for that company.

If pink sheets had been obtained for Academic Development, they would have shown that the market price of the publicly traded stock in that company had declined from $7.00—$8.00 in October to $4.50 as of December 31, 1969. This would have contradicted the assertion in the appraisal letter that there had been no adverse development regarding the value of Academic Development stock since the time of its purchase by Takara (which was in October 1969). The pink sheets for this company would have also shown that the appraisal

value of $4.00 for the restricted stock as of December 31, 1969 involved only an 11% discount from the market price of the publicly traded shares.

If pink sheets had been obtained for Computer Tools, they would have shown that the market price of the publicly traded stock as of December 31, 1969 was $0.75 per share, indicating the total invalidity of the appraisal value of $5.00 per share. If pink sheets for Medequip had been obtained, they would have shown a market price of $8.50—$9.00 per share as of December 31, 1969, indicating that the appraisal value of $10 per share involved a premium rather than the discount normally associated with restricted stock.

The pink sheets for Delanair show market prices for the publicly traded stock corresponding with the information about pink sheet quotations contained in the appraisal letter. The pink sheets for Devon International showed market prices of $5.00—$7.00 in January 1970, declining to $3.00—$5.00 in February, and rising to $8.00—$10.00 in March.

It is fair to say that, if the accountants had compared the appraisal values of the restricted securities with available market quotations, they would have learned of problems with at least some of the appraisals.

Before reaching conclusions as to what degree of fault, if any, the accountants had with respect to the restricted securities, it is appropriate to describe the conduct of the accountants regarding the put options.

There is no evidence that the accountants actually knew of the scheme of Yamada, Galanis and Morton Kaplan to create fictional put options. However, Competitive contends that the accountants knew enough to indicate that the options were highly suspect, and that the accountants willfully failed to follow through on the warnings.

The purported put options appeared indeed to be remarkably favorable to Takara Partners. Two of the options expired on March 31, 1970 and one on June 30, 1970. As of December 31, 1969 the total market value of the securities involved was only $283,625 as compared to the total option prices which Takara purportedly had a right to receive—of $694,000. In addition to these circumstances, set forth in the long form financial statements, the accountants were informed that Takara Partners had not paid any consideration to Micro Thermal for the put option rights, which as of December 31, 1969 had given Takara Partners a paper profit of $410,375.

Bier realized that the put options were highly unusual, and questioned Galanis, who provided an elaborate explanation. According to Galanis, the put option agreements were in substance credit sales to Micro Thermal. Takara Partners was in effect "factoring" the stock for Micro Thermal. The "option price" was the sum of the cost of the stock to Takara and a financing charge. Galanis stated that the arrangement between Takara Partners and Micro Thermal was that Takara would put the stocks to Micro Thermal when the market price of the stocks reached the option price, or would have the right to put the stock at the expiration dates regardless of the market value of the stocks. This, of course, was contrary to the normal idea of a put option, and contrary to the terms of the purported option agreements, which provided that Takara had the right to put the stocks *at any time* from the option agreement dates until the expiration dates.

As described earlier, Morton Kaplan had loaned $240,000 to Takara Partners in the fall of 1969, which loan Yamada and Galanis desired to conceal. Galanis stated to the accountants that this $240,000 was a down payment by Micro Thermal on the stocks involved in the put options.

There was a fourth purported put option with Micro Thermal, involving convertible debentures of Monarch Industries, which was said to have been exercised on December 31, 1969. The accountants were informed that the option price was $256,000, of which Micro Thermal paid $240,000 shortly after January 1, 1970.

During the course of their audit, the accountants were provided with copies of the

four purported option agreements. Also, on April 1, 1970 Kaplan delivered to Dear a confirmation letter regarding Micro Thermal's obligations under the option agreements. Since the confirmation letter was mistaken in one respect, a confirmation telegram was sent by Kaplan to LKH on April 1.

Bier testified that he relied heavily on the $480,000 in payments from Micro Thermal, as providing assurance that Micro Thermal would carry out its remaining obligations under the put option agreements.

Two of the options—those relating to Brilund Mines and Planet Oil—expired March 31, 1970. Bier spoke to Yamada or Galanis on March 28 or March 29, at which time Bier was told that at least one of the options might be extended. The accountants did not follow up this conversation to determine what actually occurred. In fact, the put options for Brilund Mines, Computer Studies, and Planet Oil were not exercised by Takara, since they were a fiction.

Toward the end of March 1970 Galanis had discussions with Dear about the form of the audit report. Galanis asked Dear to prepare a short form report, which omitted the schedules of the securities and the options in the Takara portfolio. Galanis explained that he did not wish to have the list of Takara's specific positions distributed, because this information might get into hands of competitors, who could trade against the Takara portfolio. Galanis also wished to have the descriptive headings in the short form report phrased so as to omit any reference to restricted securities or options.

Dear agreed to have LKH certify two forms of reports—a long form containing schedules of securities and options, and a short form omitting such schedules. Dear declined to omit from the short form the headings which referred to restricted securities and options.

### III.

In February 1970 Galanis indicated to Dear, and also to Bier and Martino, that he and Yamada might assist them in obtaining new issues of stock at issue price, which would promptly go to a premium resulting in a quick profit. Some time in March 1970 either Yamada or Galanis recommended to Bier and Martino a new issue of a company called Regency For Men. Bier and Martino purchased a total of 500 shares through Arnold Wilkins & Co. on March 13. Bier and Martino each put up $1,000. The stock was bought in the name of Martino. It was sold on March 16 for $2,860, resulting in a profit of $430 each for Bier and Martino.

In March 1970 Galanis recommended a stock called Integrated Medical Equipment to Bier and Martino. Galanis also recommended the stock to Dear. Apparently Galanis offered $6,000 worth of the stock to Bier and Martino, and $12,000 worth to Dear. Since Bier and Martino could not afford the $6,000, they arranged to have Weiner and some of Martino's relatives participate. Dear arranged to have other partners of LKH in the East Brunswick office participate in his $12,000 allocation. The public issue of Integrated stock went on the market March 26, 1970. The accountants requested confirmations on their purchases from Galanis so that they could make payment. Galanis responded that his secretary had made a mistake and had bought all the stock in Galanis's name. However, Galanis agreed to sell the stock and deliver the profits to the accountants. On or about April 14, 1970 Galanis delivered a check to Martino in the amount of $4,522. Out of this money, Bier and Martino received $1,356 each, and Weiner and Martino's relatives received the rest. Galanis delivered a check to Dear in the amount of $12,987. This check was made out to Landis & Landis, the name of the former East Brunswick, New Jersey accounting firm which was taken over by LKH. The accountants used the name of Landis & Landis in connection with this stock transaction. The $12,987 was distributed to Dear and four other LKH partners in the East Brunswick office. Dear received $3,246.

Dear has testified that there was nothing contrary to his firm's policy in taking stock recommendations from a client.

## IV.

This brings us to the question of whether Competitive has shown that defendants, or any of them, knowingly joined in the fraudulent scheme of Yamada, and knowingly produced a false audit report in order to assist Yamada in finding additional money management positions, which he could use in his stock manipulation schemes.

I find that Competitive has not made such a showing. This is true regardless of whether the burden of proof is considered to be by a preponderance of the evidence, or whether it is the standard generally required in fraud cases—*i. e.,* proof by clear and convincing evidence. *See Collins Securities Corp. v. S.E.C.,* 183 U.S.App.D.C. 301, 562 F.2d 820 (D.C.Cir.1977).

There can be little doubt that the evidence shows negligence on the part of LKH and the individual accounting defendants. Regarding the restricted securities, it is true that the accountants accumulated a set of papers which appeared literally to comply with the requirement of the Takara Partnership agreement that restricted securities be appraised by an investment banker. However, a careful auditor would have given consideration to some means of ascertaining whether the papers shown him in fact reflected bona fide appraisals by independent investment bankers. The accountants' own audit program, although its precise meaning is not entirely clear, appears to have required the accountants to compare the appraisal values with market prices of publicly traded stocks. This was not done; nor was any other step taken to attempt to verify the validity of the appraisals.

Regarding the put options, the nature of the transactions, as reflected in the documents, raised questions in Bier's mind, which he posed to Galanis. The explanations of Galanis, although they presented the transactions as being somewhat different from what was reflected in the option agreements, were accepted by Bier as showing valid transactions on which Takara would receive payment. However, Bier later learned that there was a question about whether the two options expiring March 31, 1970 would be exercised on that date. Bier should have made a full inquiry at that time, and should have realized that the question of whether the two options were or were not exercised at this time bore upon the question of their validity. Bier failed to give the matter proper consideration and failed to take appropriate action.

Nevertheless, what has just been described does not amount to knowing participation in a fraud. What was involved here was a deception practiced by Yamada and Galanis upon various victims, including the accountants. Yamada and Galanis did not set out to draw the accountants into their schemes as knowing participants. They set out to use all their considerable talents at fraud against the accountants as well as others. Both Yamada and Galanis had an unusual ability to lie convincingly. In relation to the two areas of falsity in the Takara 1969 financial statement—restricted securities and put options—the accountants were provided with a facade of documentation. In connection with the put options, Bier questioned Galanis and was given explanations. The accountants relied upon the documentation and explanations. Although, in view of all the circumstances, this was negligent, it was not fraud or the knowing certification of a false financial statement.

Competitive argues that the transactions which Yamada and Galanis had with the LKH accountants regarding new issues of stock were bribes, understood by the accountants as constituting consideration for their participation in the fraud. It is clear that Yamada and Galanis intended to influence the accountants by assisting them in obtaining profitable new issues of stock. Yamada and Galanis also used the device of holding out to the accountants the possibility of recommendations for additional accounting business. These circumstances may well have contributed to laxity on the part of the accountants, and their undue readiness to accept the presentations of Yamada and Galanis. However, this is sharply

different from the knowing acceptance of payment for participation in a fraud.[4]

## V.

Although the above findings are sufficient to preclude Competitive's recovery in this action, it is appropriate to make additional findings about the subsequent events involved in Competitive's hiring of Yamada, and the tenure of Yamada as a portfolio manager for Competitive, during which time Competitive is alleged to have suffered serious losses. These findings relate to the question of whether the 1969 Takara Partners financial statement had any causal relationship to Yamada's obtaining a position with Competitive. The findings also relate to the question of whether Competitive, at relevant times, had information about fraudulent activity by Yamada, which it ignored.

Competitive was formed in April 1969. Its investment adviser was Competitive Capital Corporation. From the very outset Competitive's performance as a mutual fund was poor. As time went on, requests to redeem shares in Competitive were heavy, and resulted in a substantial outflow of fund assets.

In March 1970 Competitive Capital was purchased by The Seaboard Corporation. It was decided at about this time to replace all of the persons who were acting as managers for the Competitive portfolio. The new president of Competitive Capital, Jerome Robert Randolph, was in charge of selecting the new portfolio managers.

Randolph had learned of Yamada in the fall of 1969 or before, and put Yamada on the list of candidates.

During May 1970 Randolph interviewed Yamada. Yamada told Randolph that he and Galanis were managing approximately $15 million in assets, which included Armstrong Investors, S.A. (an offshore mutual fund), Takara Partners, and some private accounts. Yamada sent Randolph a letter dated June 12, 1970, which stated in part:

"We presently manage a domestic partnership with $6 million in assets called Takara Partners. Takara was up 14.3% in 1969, and it is presently up 5.3% for 1970. We also manage Armstrong Investors, S.A., an offshore fund with assets in excess of $8 million. The fund commenced operations on February 15 of this year with a net asset value of $20.00 per share. Its net asset value is now $21.64 or up 8.5%. We also manage several private accounts totaling slightly over $8 million."

Enclosed with the June 12 letter was a list of the general and limited partners of Takara Partners and a prospectus of Armstrong Investors, S.A.

The 1969 Takara Partners financial statement was not enclosed with the June 12, 1970 letter, nor was it received by Randolph or by anyone else at Competitive or Competitive Capital who had anything to do with the hiring of Yamada. Although the June 12, 1970 letter provides some figures about Takara Partners, these figures are materially different from any information contained in the Takara Partners financial statement. The financial statement shows assets of $4.25 million, whereas the letter refers to $6 million. The 14.3% figure in the letter cannot be derived from the financial statement. There is nothing in the financial statement describing alleged 5.3% growth during 1970.

Randolph telephoned two investment banking firms and received favorable comments about Yamada, which made no reference to any information contained in the Takara Partners 1969 financial statement.

The new portfolio managers needed to be approved by the shareholders of Competi-

---

**4.** Competitive introduced a substantial body of evidence about conduct of the accounting defendants following the completion of their work on the Takara Partners 1969 financial statement. Part of this evidence related to work on the audit of the 1970 Takara Partners financial statement, which audit was never completed. I believe it unnecessary to make detailed factual findings regarding this evidence. My finding is that Competitive has failed to prove that there was knowing participation by the accountant defendants *at any time* in Yamada's fraudulent schemes.

tive, upon recommendation of Competitive's board of directors. The shareholders' meeting was scheduled for October 9, 1970.

Randolph decided to recommend Yamada as one of the new portfolio managers for Competitive. Several of the other candidates had withdrawn from consideration, because they did not consider the position desirable.

The board of directors of Competitive met on June 25, 1970 and decided to recommend Yamada for approval by the Competitive shareholders. Yamada was to act as portfolio manager through an entity named Takara Asset Management Corporation. It was understood that Yamada would be assisted by Galanis and another person by the name of Louis G. Zachary.

Commencing in September 1970 Competitive began receiving unfavorable information about Yamada.

Competitive learned that Galanis and Zachary had severed ties with Yamada. This was regarded by Randolph and others as a detrimental development, but they decided that the recommendation of Yamada to the Competitive shareholders would not be withdrawn, since the proxy statement calling for the shareholders' vote had already been sent out.

Additional adverse information about Yamada came to Competitive from one Philip Getter of Devon Securities (apparently not related to Devon International). Getter and Devon Securities were known to, and respected by, Competitive.

Devon Securities had acted as a broker for Yamada's Armstrong fund. Also, Venezuelan clients of Devon Securities had invested in Armstrong through Devon's Caracas office. Various problems arose between Armstrong and Devon Securities, resulting in Devon's termination of its brokerage relationship with Armstrong in May 1970. In the summer of 1970 clients of Devon were experiencing problems in attempts to redeem shares of Armstrong.

In July 1970 Getter received a telephone call from an S.E.C. staff member requesting information about three securities. The staff member stated that Yamada and Galanis were involved with these three securities. The oral inquiry was confirmed by a letter.

In September 1970 Getter learned of Competitive's intention to hire Yamada as a portfolio manager. Getter thereupon telephoned Richard E. Boesel, Jr., president and chairman of the board of Competitive, and told Boesel (according to Getter's trial testimony):

" . . . that I thought Yamada and Galanis were thieves; I thought they had stolen money from the funds; they were dealing in nonexistent securities; they were dealing in restricted securities, contrary to their investment objective; and their reputation on the street at that time was quite suspect and it was coming to us from many, different sources."

Getter also told Boesel about the S.E.C. inquiry.

Getter gave the same information and warnings to Randolph, and also to Alan R. Markizon, who was an attorney employed by Seaboard and was also assistant secretary of Competitive. Boesel discussed the Getter information with Randolph and also with Ezra Levin, an attorney for Competitive.

At about the same time Levin heard from three separate sources that the S.E.C. was conducting an investigation which involved Yamada and Galanis. Levin relayed this information to Boesel.

Although there was some talk of inquiring further about the information received, all meaningful inquiry was carefully avoided prior to the October 9, 1970 shareholders' meeting. No one from Seaboard or Competitive made any inquiry of the S.E.C. There was no attempt to question Yamada. There was no effort to communicate directly with the Armstrong fund, although Getter of Devon Securities had advised Boesel and others that Yamada's conduct had caused serious problems for that fund and its investors.

On October 9, 1970 the meeting of the Competitive shareholders was held in Los

Angeles. A meeting of the board of directors of Competitive was held in New York City following the shareholders' meeting. The shareholders approved the new portfolio managers, including Yamada's Takara Asset Management. None of the adverse information about Yamada, described above, was conveyed to the Competitive shareholders prior to their vote.

Boesel and Levin were present at the October 9 board meeting. Also attending the meeting were Peter Landau and Meyer Eisenberg, attorneys for Seaboard, who were also aware of the information about Yamada. According to the minutes, the Yamada matter was passed off rather quickly with a statement by Boesel about "rumors" of an S.E.C. investigation of Yamada, and a reply by Eisenberg that "no evidence had been uncovered of any wrongdoing or of anything irregular."

Since no inquiry had been made by anyone at Seaboard or Competitive, there was no basis for Eisenberg's comforting assurance that no evidence of wrongdoing had been uncovered.

On October 12, 1970 Philip Smith, another attorney for Seaboard, telephoned Yamada's attorney, and inquired about the S.E.C. investigation. Smith was told that Yamada denied that there was such an investigation. Smith did not follow the matter further.

Yamada commenced his activity as portfolio manager for Competitive on October 12, 1970. All securities transactions authorized by Yamada for Competitive were processed through an employee of Seaboard by the name of Clifford A. McSwain. Randolph was informed of all the transactions on a daily basis. McSwain became concerned that Yamada was purchasing thinly traded over-the-counter securities, and was acquiring a substantial part of the float of such securities. In McSwain's view this created potential liquidity problems for Competitive.

On December 18, 1970 Competitive sent a letter to its shareholders discussing the new portfolio managers and praising their outstanding backgrounds.

In mid-December 1970 Levin, in conversation with a friend, obtained what he considered to be further confirmation that there was an S.E.C. investigation of Yamada. He so advised Boesel.

On January 8, 1971 Levin called the S.E.C. and was told that he could arrange to obtain a copy of an order of investigation which had been issued. On December 10, 1970 the S.E.C. had issued an order directing an investigation of Galanis and Yamada, and an entity of theirs called Everest Management Corporation, which managed the portfolio of Armstrong Investors, S.A. The order raised issues about whether Yamada, Galanis and Everest had engaged in manipulations, had directed investment advisory clients to purchase securities at artificially inflated levels, had purchased securities for clients in disregard of the investment merits of such securities, and had otherwise engaged in fraudulent and deceptive practices. On January 12, 1971 an associate of Ezra Levin reviewed the S.E.C. order of investigation at an S.E.C. office and took detailed notes of its contents. The facts were immediately reported to Levin.

In early January 1971 Competitive and Seaboard also learned of a lawsuit brought by Armstrong Investors, S.A. against Yamada, Galanis and Everest Management Corporation, alleging that the defendants had engaged in fraudulent and manipulative practices in respect to securities purchased for the Armstrong portfolio. This action had been commenced on December 4, 1970 in the United States District Court for the Southern District of New York.

On January 13, 1971 a meeting of the Competitive board of directors was held, the main purpose of which was to question Yamada. Both Yamada and his then attorney, Ira Smith, attended. Yamada and his attorney were asked mainly about the S.E.C. investigation and the Armstrong lawsuit. In general, Yamada claimed that problems about questionable transactions were the fault of Galanis, from whom he had dissociated himself. Yamada denied that there was any S.E.C. investigation directed against himself. After Yamada and

Smith left the meeting, there was a discussion among the directors, which is not recorded in the minutes.

The information which had been accumulated by Competitive prior to the January 13, 1971 board meeting, and the discussion at that meeting, raised grave doubts, to say the least, about the propriety of having Yamada as a portfolio manager. The only rational course was to terminate Yamada, or at least suspend him. Yet no step of this nature was taken, and Yamada was allowed to continue functioning. The only conclusion which can be drawn from this is that the directors were virtually paralyzed by fear of the embarrassment which would arise if the facts about Yamada were disclosed to the shareholders in connection with any action against him by the board. The directors chose to take the extraordinary and culpable risk of retaining Yamada and concealing the facts from the shareholders.

The inevitable termination of Yamada occurred on May 13, 1971. However, during the period January 13–May 13, 1971, Yamada purchased for the Competitive portfolio large amounts of virtually worthless securities. The losses on these purchases constitute a substantial portion of the damage claim made by Competitive in the present action.

## VI.

This brings us to a discussion of the legal standards applicable to this case and the conclusions of law which must ultimately be made.

█ The rule in damage cases under Section 10(b) and Rule 10b–5 is that there is no liability in the absence of proof of "scienter"—*i. e.*, intent to deceive, manipulate, or defraud. Negligent conduct is not grounds for liability. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 214, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

In *Hochfelder*, the Seventh Circuit had held that there was liability under the statute and rule for negligent nonfeasance, and that such negligence could constitute aiding and abetting in a third party's violation of the statute and rule, which would subject the aider and abettor to liability for damages. 503 F.2d 1100 (1974). The Supreme Court held that negligent nonfeasance was insufficient to create liability, but declined to consider whether there was civil liability for aiding and abetting under the statute and rule, or what would be the necessary elements to establish such a cause of action. 425 U.S. at 191–92, n.7, 96 S.Ct. 1375.

The Second Circuit has held that there is liability under the statute and rule for aiding and abetting a securities fraud. *Hirsch v. du Pont*, 553 F.2d 750 (2d Cir. 1977). This Circuit has held that reckless misconduct may constitute aiding and abetting sufficient to impose liability, where the defendant has a fiduciary duty to the victim of the fraud. *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). However, this Circuit has declined to hold a defendant liable as an aider and abettor on a theory of reckless failure to discover a fraud, where the defendant had no fiduciary relationship to the plaintiff. *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.*, 602 F.2d 478 (2d Cir. 1979).

In actions seeking to hold accountants liable for incorrect financial statements, the courts are concerned about "remote" claims by plaintiffs to whom the financial statements were not directed. *See Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931). In *Hochfelder, supra*, the plaintiffs claimed that they had been defrauded by one Nay into investing in certain securities. Nay was president of a firm called First Securities. The securities sales in question were not in the regular course of the business of First Securities; they were private fraudulent transactions by Nay. The plaintiffs contended that the accountants for First Securities were liable to them for their losses in dealing with Nay. The plaintiffs asserted that the accountants, in their examination of the First Securities financial statements, had been negligent and had failed to employ proper auditing procedures which would have uncovered Nay's miscon-

duct. The Supreme Court stated (425 U.S. 185, 214–16 n.33, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668):

> "We do note that the standard urged by respondents would significantly broaden the class of plaintiffs who may seek to impose liability upon accountants and other experts who perform services or express opinions with respect to matters under the Acts.

> .  .  .  .  .

> "This case, on its facts, illustrates the extreme reach of the standard urged by respondents. As investors in transactions initiated by Nay, not First Securities, they were not foreseeable users of the financial statements prepared by Ernst & Ernst. Respondents conceded that they did not rely on either these financial statements or Ernst & Ernst's certificates of opinion. The class of persons eligible to benefit from such a standard, though small in this case, could be numbered in the thousands in other cases. Acceptance of respondents' view would extend to new frontiers the 'hazards' of rendering expert advice under the Acts, raising serious policy questions not yet addressed by Congress."

Competitive concedes, as it must, that it cannot hold defendants liable on a theory of negligence. At least since the time of its appeal from the summary judgment decision, Competitive has basically rested its case on the claim that the accountant defendants knowingly assisted Yamada in his stock manipulation activity, and knowingly certified a false Takara Partners financial statement in order to enhance his credentials in seeking vehicles for the perpetration of fraud. This is the claim which the Court of Appeals accepted as Competitive's theory of the case in reversing the granting of summary judgment and remanding the case for trial. *Competitive Associates, Inc. v. Laventhol Krekstein Horwath & Horwath*, 516 F.2d 811 (2d Cir. 1975).

Although the claim of intentional participation in Yamada's fraud has been the principal focus of Competitive's submissions, Competitive also poses an alternative theory of recklessness, relying upon *Rolf v. Blyth, Eastman Dillon & Co., supra.*

■ Applying the various relevant authorities, I conclude that Competitive has not proved the requisite degree of fault on the part of the accounting defendants, or any of them, to hold them liable. Although Competitive has made out a case of negligence, it has not shown scienter—knowing falsification or misrepresentation. *A fortiori*, Competitive has failed to show that the accountant defendants knowingly assisted Yamada in his stock manipulation schemes.

It is important also to note that this is a case which falls within the warning of *Hochfelder, supra*, and other decisions, against allowing recovery to "remote" plaintiffs who are outside of the range of what the law deems to be the reasonably foreseeable victims of tortious activity. *See Edwards & Hanly v. Wells Fargo Securities Clearance Corp., supra.*

If the accounting defendants had knowingly certified a false Takara Partners financial statement with the purpose of assisting Yamada in pursuing his fraudulent schemes, it would be appropriate to hold the accountants liable to Competitive, since under these circumstances it would be realistic to say that Competitive *was* in fact within the foreseeable-range of victims of the accountants' conduct.

However, Competitive has not made out such a case. As far as the accounting defendants were concerned, the Takara Partners 1969 financial statement was for the use of the general and limited partners of that entity, potential new investors, and other persons who might do business with Takara partners. There is no credible evidence that they contemplated, or had any reason to contemplate, that the financial statement would have some indirect influence upon a mutual fund such as Competitive in hiring Yamada. Under the facts of this case, Competitive's claim is too remote to be sustained.

I also hold that Competitive has not made out a case of recklessness within the meaning of the authorities. *See Lanza v. Drexel*

& Co., 479 F.2d 1277, 1306 (2d Cir. 1973); *Rolf v. Blyth, Eastman Dillon & Co., supra.* In any event, there is no occasion for applying the rule of the *Rolf* case, since the accounting defendants had no fiduciary relationship with Competitive. *See Edwards & Hanly v. Wells Fargo Securities Clearance Corp., supra* at 484.

An additional reason for denying recovery to Competitive relates to its own conduct, viewed in light of its claim that it was misled into believing in the competence and trustworthiness of Yamada, and that the satisfactory Takara Partners financial statement had assisted in sustaining Yamada's reputation and credentials. At the time Yamada was hired by Competitive—*i. e.,* at the time of the Competitive shareholders' meeting of October 9, 1970—the responsible officials of Competitive had information warning them of grave risks in hiring Yamada as a portfolio manager. They had been informed by a reliable source that Yamada was guilty of fraud in connection with the Armstrong fund. They had been told of an S.E.C. investigation affecting Yamada. The officials of Competitive deliberately closed their eyes to these warnings, failed to follow them with any meaningful inquiry, and chose to hire Yamada in order to prevent embarrassment to their troubled mutual fund. A few months later, when the officers and directors of Competitive knew that the Armstrong fund had sued Yamada for fraud, and knew that a formal order for the investigation of Yamada had been issued by the S.E.C., Competitive failed to terminate or suspend Yamada. The directors interviewed Yamada at a board meeting of January 13, 1971, at which time they knew, or should have known, that Yamada was lying to them. Nevertheless, Yamada was allowed to continue handling the assets in his segment of the Competitive portfolio for another five months, until May 13, 1971.

It must be concluded that, at the time Competitive hired Yamada, Competitive possessed, or had ready access to, information which more than dissipated any enhancement of Yamada's reputation which had been created by the Takara Partners financial statement, issued some months earlier. Under these circumstances there can be no recovery by Competitive against the accounting defendants. *Hirsch v. du Pont,* 553 F.2d 750, 762–63 (2d Cir. 1977).

### *Conclusion*

The action against Laventhol Krekstein Horwath & Horwath, Morton Dear, Robert E. Bier, and Thomas Martino, Jr. is dismissed. Defendants are directed to submit a judgment.

So ordered.