CHEMICAL BANK, Plaintiff,

v.

ARTHUR ANDERSEN & CO., Gerald Lee, Mervyn Silver, Joseph Heilbrun, and John Does, Numbered One through Twenty, the latter being fictitious names, Defendants.

MANUFACTURERS HANOVER TRUST COMPANY and First Pennsylvania Bank, N.A., Plaintiffs,

v.

ARTHUR ANDERSEN & CO., Gerald Lee, Mervyn Silver and Joseph Heilbrun, Defendants.

SECURITY PACIFIC NATIONAL BANK, Plaintiff,

v.

ARTHUR ANDERSEN & CO., Gerald Lee, Mervyn Silver and Joseph Heilbrun, Defendants.

Nos. 79 Civ. 2474 (GLG), 79 Civ. 2533 (GLG) and 79 Civ. 2928 (GLG).

United States District Court, S.D. New York.

Dec. 21, 1982.

---

Patterson, Belknap, Webb & Tyler, New York City, for plaintiff; Michael B. Mukasey, Ann R. Loeb, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for plaintiffs Manufacturers Hanover Trust Co., First Nat. Bank, N.A., and Sec. Pacific Nat. Bank; Michael D. Hess, Irwin H. Warren, Florence M. Fass, Ira N. Glauber, New York City, of counsel.

Breed, Abbott & Morgan, New York City, and Wilson & McIlvaine, Chicago, Ill., for defendant Arthur Andersen & Co.; Edward J. Ross, New York City, and Charles W. Boand, Chicago, Ill., of counsel.

## OPINION

GOETTEL, District Judge:

This is an action [1] for violations of section 10(b) and rule 10b–5 of the Securities Exchange Act of 1934 (1934 Act), section 17(a) of the Securities Act of 1933 (1933 Act), and state common law. Before this Court is defendant Arthur Andersen & Co.'s (Andersen) motion to dismiss and for summary judgment.

The plaintiffs in this action are four commercial banks, Manufacturers Hanover Trust Company (MHT), First Pennsylvania Bank, N.A. (First Pennsylvania), Chemical Bank (Chemical), and Security Pacific National Bank (Security Pacific). (They will be referred to collectively as the Banks.[2] The principal defendant [3] is Andersen, a public accounting firm with offices throughout the United States and the world. From 1973 until 1979, Andersen was the independent public accountant for the Frigitemp Corporation (Frigitemp), a New York corporation that is now in bankruptcy.[4]

---

1. Put precisely, there are three actions: *Chemical Bank v. Arthur Andersen & Co.,* No. 79 Civ. 2474; *Manufacturers Hanover Trust Co. and First Pennsylvania Bank, N.A. v. Arthur Andersen & Co.,* No. 79 Civ. 2533; and *Security Pacific National Bank v. Arthur Andersen & Co.,* No. 79 Civ. 2978. Because the complaints are virtually identical, *see infra* note 9, this Court will write as if there is one complaint and one action. When there are important distinctions among the actions, they will be noted.

2. MHT is a New York corporation with its principal place of business in New York. First Pennsylvania is a National Banking Act corporation with its principal place of business in Philadelphia. Chemical is a New York corporation with its principal place of business in New York. Security is a National Banking Act corporation with its principal place of business in Los Angeles.

3. The other named defendants are Gerald Lee, Mervyn Silver, and Joseph Heilbrun. At all times relevant to this lawsuit, Gerald Lee was the Chairman of the Board, Chief Executive Officer, and a director of the Frigitemp Corporation, Mervyn Silver was the President, Executive Vice President, Chief Operating Officer, and a director of the Frigitemp Corporation, and Joseph Heilbrun was the Senior Vice President, Treasurer, and a director of the Frigitemp Corporation. Moreover, an additional 21 John Doe defendants are mentioned in the Chemical complaint.

4. On March 20, 1978, Frigitemp petitioned for an arrangement pursuant to Chapter XI of the Bankruptcy Act in the Bankruptcy Court of the United States District Court for the Southern District of New York. According to the Banks,

This lawsuit arises from a series of loans made by the Banks to Frigitemp and one of its wholly owned subsidiaries, Elsters, Inc. (Elsters). During the mid-1970's, Frigitemp, which had earlier embarked upon a course of rapid expansion, required large amounts of capital, and it looked to the Banks for financing. The Banks obliged.

The money was advanced and the obligations of the parties defined in three transactions. The first will be called the Secured Credit Transaction. In a contract dated December 31, 1975 (the Secured Credit Agreement), the Banks agreed to provide Frigitemp with a line of credit up to $8 million. Beginning in 1976, the Banks advanced approximately $6.5 million to Frigitemp. These advances were secured by a pledge of Frigitemp's customer notes receivable and were evidenced by Frigitemp's promissory notes.

The second transaction will be called the Unsecured Loan Transaction. In September 1976, the Banks and Frigitemp began discussing the need to restructure Frigitemp's debt. Pending formal restructuring, which was expected to occur in 1977, Frigitemp asked for and received a $5 million short term loan from MHT, Chemical, and Security Pacific. The funding took place in two stages. In September 1976, the Banks advanced $1.5 million to Frigitemp, and Frigitemp gave a one month promissory note to each bank. In October 1976, the three banks advanced $3.5 million to Frigitemp, and Frigitemp gave each bank a three month promissory note that reflected the September 1976 financing and that matured on February 28, 1977. (The maturity of these notes was later extended to April 30, 1977.) In February 1977, Frigitemp received an additional $4 million unsecured loan from all four banks and gave each bank a promissory note that matured on April 30, 1977.

The final transaction occurred in August 1977. From March 1977 until August 1977, Frigitemp's management and members of the Banks' senior management discussed Frigitemp's future financial needs and the terms and conditions of the debt restructuring. The fruit of these negotiations was the August 1977 transaction, in which the Banks restructured Frigitemp's debt and provided $4 million in new financing to Elsters.

There were essentially three parts to this transaction, although the Banks maintain that "[a]ll three agreements (plus the Pledge and Guarantee) were structured as, and were intended to be, part of one single, integrated refinancing package." O'Neill Affidavit ¶ 26. First, the Banks extended the maturity date on the unsecured notes from April 30, 1977 to March 31, 1978. To reflect this change, Frigitemp executed new notes in substitution for the prior indebtedness. (These will be called the Replacement Notes.) Second, the Banks extended the maturity date on the notes issued pursuant to the Secured Credit Agreement from July 1, 1977 to July 1, 1978. See id. ¶ 28. To reflect this change, the notes were amended by endorsements dated August 9, 1977. (These will be called the Note Endorsements.) Finally, the Banks advanced $4 million to Elsters. Elsters gave the Banks promissory notes that matured on March 31, 1978; Frigitemp guaranteed the loan and pledged 100% of Elsters common stock, 750 shares, pursuant to a Pledge and Security Agreement.

Thus, as of August 1977, Frigitemp and Elsters owed the Banks approximately $19.5 million. By the time that Frigitemp filed its bankruptcy petition in 1978, however, only approximately one-third of that amount had been repaid.[5]

The Banks commenced this action in 1979 in what is essentially an attempt to hold Andersen liable for these losses. They allege that they entered into the transactions with Frigitemp and Elsters in reliance on Frigitemp's financial statements audited and certified by Andersen for the years 1973–1976 and that these statements were

the pendency of the bankruptcy proceeding is the only reason that Frigitemp was not named as a defendant in this action.

5. The Banks did, however, assign four notes to third parties for approximately $407,345 each.

materially false and misleading.[6] According to the Banks, Andersen's conduct in preparing and certifying these statements amounted to violations of the securities laws: the first claim is that Andersen violated section 17(a) of the 1933 Act and section 10(b) and rule 10b–5 of the 1934 Act; the fourth claim is that Andersen aided and abetted violations of these provisions.[7]

**6.** The Banks allege that the statements were false and misleading in the following respects:
a) the profit reported from long-term contracts was materially overstated because the costs to Frigitemp of fulfilling those contracts were consistently understated;
b) Frigitemp's report of its income and its current assets included sums representing amounts claimed as owed to Frigitemp for material costs and work done as additions to or changes from specifications under certain long-term contracts. Such amounts were materially overstated and included amounts for work not actually performed and for work which was not then billed to or approved by Frigitemp's customers; and
c) Frigitemp's accounts receivable were overstated in the following respects, among others:
(i) Frigitemp was overbilling its customers;
(ii) Frigitemp reported unbilled amounts which in material respects were not billable as receivables;
(iii) Frigitemp allocated payments received on current receivables to older receivables, thereby understating the amount of aged receivables of doubtful collectibility;
(iv) the disputed claim reported in the 1976 Statements as a receivable in the sum of $8.9 million was spurious and improperly documented and should not have been reported as a receivable; and
(v) other claims for which work had not been performed by Frigitemp were reported as receivables.
MHT Complaint ¶ 21. The same allegations are contained in paragraph 20 of the *Security Pacific* Complaint and paragraph 22 of the *Chemical* Complaint.

It should also be noted that alleged misrepresentations in Frigitemp's financial statements have spawned two other actions that are pending before this Court, *Aeronca, Inc. v. Gorin,* No. 80 Civ. 1509, and *Peerless Insurance Co. v. Arthur Andersen & Co.,* No. 80 Civ. 2556, as well as a settled class action involving a public offering. *Litowitz v. Arthur Andersen & Co.,* No. 78 Civ. 3100.

**7.** The second and third claims are for violations of state law. They are not germane to this motion.

Andersen filed this motion in 1982, after extensive discovery. It contends that this Court lacks jurisdiction because the alleged fraud was not "in connection with" the purchase or sale of a security and that the complaint fails to state a claim against Andersen as either a primary violator of the securities laws or as an aider and abettor.[8] For the reasons stated below, Andersen's motion is denied.[9]

**8.** Andersen also makes two other arguments in support of its motion. First, it argues that the Banks were members of the class in a class action captioned *Litowitz v. Arthur Andersen & Co.,* No. 78 Civ. 3100 (S.D.N.Y. Nov. 25, 1981), and that, because of the settlement and judgment in that action, the Banks' claims are barred by *res judicata.* Even if it is assumed that the Banks were class members, the Court disagrees. The settlement and judgment in the *Litowitz* action, which was based on the purchase of Frigitemp common stock and debentures, cannot be held to bar the claims based on notes issued by Frigitemp and on loans guaranteed by Frigitemp and secured by a pledge of Elsters stock. *See National Super Spuds, Inc. v. New York Mercantile Exchange,* 660 F.2d 9, 17–19 (2d Cir.1981). Second, Andersen argues that, as a matter of policy, this Court should not recognize a private cause of action under § 10(b) of the 1934 Act and § 17(a) of the 1933 Act "to recover a loss on an unpaid loan, whether or not represented by a note or secured by stock." Memorandum of Law of Defendant Arthur Andersen & Co. in Support of Motion to Dismiss and for Summary Judgment at 32. Although this Court has considered these policy arguments in determining whether the notes in question are securities, it will not use them to deny a cause of action to the Banks even though the Banks have stated a claim under § 10(b) and § 17(a). To this Court's knowledge, there have been no cases in which a cause of action under the securities laws has been denied solely because the allegedly defrauded party was a bank.

**9.** Before proceeding to the discussion of the legal issues, two things should be mentioned. On this motion, the Court has accepted as true all facts pleaded in the complaint and has drawn all inferences of fact in favor of the Banks, the parties opposing the motion. In essence, the Court has examined the pleadings, affidavits, and documents and has determined whether the Banks' version of the facts is sufficient to state a claim under § 10(b) and § 17(a). To the extent that Andersen argues that the Banks cannot prove their claims, the argument is rejected at this time; the Banks

*I. Jurisdiction Under the Securities Laws*

The *sine qua non* of a federal court's jurisdiction to hear a claim under section 10(b) of the 1934 Act is a misrepresentation "in connection with the purchase or sale of [a security]," 1934 Act § 10(b), 15 U.S.C. § 78j(b) (1976); under section 17(a) of the 1933 Act, it is a misrepresentation "in the offer or sale of [a security]," 1933 Act § 17(a), 15 U.S.C. § 77q(a) (1976). The Banks assert that these requirements are satisfied by virtue of the notes issued in connection with the August 1977 transaction and the pledge of Elsters stock. Andersen, on the other hand, argues that the notes are not securities [10] and that the alleged fraud was not "in connection with" the pledge of Elsters stock.

### A. The Notes As Securities

Three types of notes were issued in connection with the August 1977 transaction. First, there were the Replacement Notes issued by Frigitemp to the Banks in substitution for the prior unsecured indebtedness. These notes were issued on August 9, 1977 and matured on March 31, 1978, a period of approximately eight months. They provided for a definite rate of interest tied to the prime rate of the lending bank, and they were unsecured. Second, there were the Note Endorsements that amended the notes issued pursuant to the Secured Credit Agreement. The endorsements were dated August 9, 1977 and extended the maturity date on the notes to July 1, 1978. The notes, as amended, provided for a definite rate of interest tied to the prime rate of the lending bank, and they were secured by Frigitemp's customer notes receivable. Third, there were the notes issued by Elsters to reflect the $4 million advance. These notes were issued on August 9, 1977 and matured on March 31, 1978, a period of approximately eight months. They provided for a definite rate of interest tied to the prime rate of the lending bank, and they were secured by Frigitemp's pledge of Elsters common stock. Moreover, the underlying loan agreement provided that the proceeds of the loan were to be added to Elsters' working capital for use in the ordinary course of business.

Whether these notes are securities is not an easy question. The 1933 Act provides that, unless the context otherwise requires, "[t]he term 'security' means any note." 1933 Act § 2(1), 15 U.S.C. § 77b(1) (1976). Although "[a]ny note ... which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited," is exempt from the 1933 Act's registration requirements, 1933 Act § 3(a)(3), 15 U.S.C. § 77c(a)(3) (1976), it is clear that this exemption does not apply to the Act's antifraud provisions. *Exchange National Bank v. Touche Ross & Co.,* 544 F.2d 1126, 1131 (2d Cir.1976) (quot-

---

have met their burden of showing the existence of genuine issues of material fact. *See* Fed.R. Civ.P. 56.

Second, the Banks have also moved for leave to amend their complaints to reflect transactions in which the Banks made personal loans to certain officers of Frigitemp and accepted pledges of Frigitemp common stock as security for the loans. Additionally, Chemical has moved for leave to amend its complaint further to conform with the complaints in the other two actions. Insofar as Chemical seeks to conform its complaint, the motion is granted. As to the remainder of the motion, the Court expresses no opinion at this time. It should be noted, however, that if the Court had concluded that it had no subject matter jurisdiction over the claims arising from the loans to Frigitemp and Elsters, and if it had permitted the Banks to amend, the Court would not have used the claims arising from the loans to the Frigitemp officers as a basis for exercising pendent jurisdiction over the other claims. *See generally* 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3567 (1975).

10. In its reply papers, Andersen also argues that the issuance of the Replacement Notes and the Note Endorsements cannot qualify as purchases of new securities because they merely reflect loans that had previously been made. The Court, however, believes that acceptance of these notes by the Banks constituted a new investment decision and, consequently, purchases within the meaning of the securities laws. *See Fischer v. New York Stock Exchange,* 408 F.Supp. 745, 755 (S.D.N.Y.1976).

ing *Zeller v. Bogue Electric Manufacturing Corp.,* 476 F.2d 795, 799 (2d Cir.), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973)); Sonnenschein, *Federal Securities Law Coverage of Note Transactions: The Antifraud Provisions,* 35 Bus.Law. 1567, 1572, 1574–75 (1980); *see* 1933 Act § 12(2), 15 U.S.C. § 77*l*(2) (1976); *id.* § 17(c), 15 U.S.C. § 77q(c) (1976). The 1934 Act provides that unless the context otherwise requires, "[t]he term security means any note . . . but shall not include any note . . . which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." 1934 Act § 3(a)(10), 15 U.S.C. § 78c(a)(10) (1976). Thus, a literal reading of the statutes would mean that all notes are securities for purposes of section 17(a) of the 1933 Act and all notes with a maturity of greater than nine months are securities for the purposes of section 10(b) of the 1934 Act.

Despite the broad statutory language, however, not every note is a security. *Oliver v. Bostetter,* 426 F.Supp. 1082, 1085 (D.Md.1977); *see Exchange National Bank v. Touche Ross & Co., supra,* 544 F.2d at 1133–37; *Zeller v. Bogue Electric Manufacturing Corp., supra,* 476 F.2d at 800. Perceiving that Congress, in passing the securities laws, intended to protect investors, *see Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967), and not "to regulate commercial loan transactions that would have no impact on the securities markets," *American Fletcher Mortgage Co. v. U.S. Steel Credit Corp.,* 635 F.2d 1247, 1254 (7th Cir.1980), *cert. denied,*

451 U.S. 911, 101 S.Ct. 1982, 68 L.Ed.2d 300 (1981), most courts have held that, regardless of maturity, a note is a security only if it evidences an investment transaction; if it merely reflects a commercial loan transaction, the provisions of the securities laws do not apply. *Id.* at 1254; *National Bank of Commerce v. All American Assurance Co.,* 583 F.2d 1295, 1301 (5th Cir.1978); *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1256 (9th Cir.1976); *C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc.,* 508 F.2d 1354, 1359 (7th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); *McClure v. First National Bank,* 497 F.2d 490, 493–95 (5th Cir.1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975); *Briggs v. Sterner,* 529 F.Supp. 1155, 1167 (S.D.Iowa 1981); *Robbins v. First American Bank,* 514 F.Supp. 1183, 1187–88 (N.D.Ill.1981); *see Exchange National Bank v. Touche Ross & Co., supra,* 544 F.2d at 1134–37; Sonnenschein, *supra,* at 1587–89. This is known as the commercial-investment dichotomy. *See National Bank of Commerce v. All American Assurance Co., supra,* 583 F.2d at 1301; *Great Western Bank & Trust v. Kotz, supra,* 532 F.2d at 1256; Sonnenschein, *supra,* at 1588.

Courts utilizing the commercial-investment dichotomy judge a particular note transaction "against the attributes of an 'investment' and [accord antifraud coverage only to those transactions that sufficiently] display those attributes." Sonnenschein, *supra,* at 1588. The Ninth Circuit, for example, has noted that factors such as the term of the note,[11] the nature and extent of collateralization,[12] the form of the obligation,[13] the circumstances of issuance,[14] the

---

11. [T]he longer one's funds are to be used by another, the greater the risk of loss.
   A demand or short-term note is almost *ipso facto* not a security unless payment is dependent upon the success of a risky enterprise, or the parties contemplate indefinite extension of the note or perhaps conversion to stock. 532 F.2d at 1257–58.

12. "The unsecured lender is generally more dependent upon the managerial skills of the borrower than is a secured party who can look to

the collateral in case of inability to repay." 532 F.2d at 1258 (footnote omitted).

13. "While not controlling, the form utilized may help to explain the circumstances of issuance of the obligation." 532 F.2d at 1258.

14. "Whether the obligations were issued to a single party or to a large class of investors sheds light on the nature of the financing." 532 F.2d at 1258.

relationship between the amount borrowed and the size of the borrower's business,[15] and the contemplated use of the proceeds [16] can be useful in determining whether a given note transaction represents an investment. *Great Western Bank & Trust v. Kotz, supra,* 532 F.2d at 1257–58.[17] If these factors were applied to the present case, a result that the notes did not represent an investment worthy of protection under the securities laws would certainly seem defensible. First, the notes were for a short term: the Replacement Notes and the Elsters notes had a maturity of less than nine months, the Note Endorsements had a maturity of eleven months. Second, the Note Endorsements and the Elsters notes were fully secured: the Note Endorsements by Frigitemp's customer notes receivable, the Elsters notes by 100% of Elsters common

stock. Third, the notes were for a fixed amount, had a fixed maturity, and had a stated rate of interest. Thus, repayment did not depend solely upon the profit or productivity of Frigitemp and Elsters. *See National Bank of Commerce v. All American Assurance Co., supra,* 583 F.2d at 1301. Finally, a large class of investors was not involved. The obligations evidenced by the notes and the underlying agreements resulted from months of negotiations between the parties and were tailored to meet the needs of both Frigitemp and the Banks. In sum, the notes had the essential characteristics of an instrument representing a commercial loan. *See generally Great Western Bank & Trust v. Kotz, supra,* 532 F.2d at 1260 ("A note given to a bank in the course of a commercial financing transaction is not generally a security within the meaning of

**15.** "[T]he larger the relative amount, the greater the stake, and therefore the risk, of the lender." 532 F.2d at 1258.

**16.** "Proceeds constituting an essential ingredient of enterprise formation .. are generally securities. On the other hand, those used to maintain current financial position generally are not." 532 F.2d at 1258.

**17.** Other circuits have also suggested criteria for distinguishing commercial notes from investment securities. The Seventh Circuit, for example, found the following criteria helpful: (1) how is the instrument characterized in the business community? (2) how are the proceeds to be used (if for consumer goods or particular business goods or services—not covered, but if for general financing of borrower's enterprise—covered)? (3) extent of reliance on efforts of others (placing funds at great risk, giving note payee extensive collateral rights, making repayment of funds contingent upon some event, all tend to indicate security rather than loan); (4) number of notes issued, number of payees, dollar amount of transaction; (5) payable on demand or if payable at fixed time, how long is the time between issuance and maturity? and (6) characterization of notes on relevant financial statements. *C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc., supra,* 508 F.2d at 1361. The Fifth Circuit has noted that when "notes have been deemed securities within the meaning of the securities laws, either of two factors ... usually indicated the investment overtones of the underlying transactions," *McClure v. First National Bank, supra,* 497 F.2d at 493 (footnote omitted): first, the notes were offered to a class of

investors and acquired for speculation or investment, *id.;* second, the borrower "obtain[ed] investment assets, directly or indirectly, in exchange for its notes," *id.* at 494.

Despite the attempts to articulate the general characteristics of an investment transaction, however, most courts recognize that no mechanical formula can be used to establish a precise line of demarcation between investment and commercial transactions. *Great Western Bank & Trust v. Kotz, supra,* 532 F.2d at 1258; *C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc., supra,* 508 F.2d at 1359, 1362 & n. 14; *Robbins v. First American Bank, supra,* 514 F.Supp. at 1187–88; *see Sonnenschein, supra,* at 1589. As the Seventh Circuit noted,

[i]n one sense every lender of money is an investor since he places his money at risk in anticipation of a profit in the form of interest. Also in a broad sense every investor lends his money to a borrower who uses it for a price and is expected to return it one day.

On the other hand, the polarized extremes are conceptually identifiable: buying shares of the common stock of a publicly-held corporation, where the impetus for the transaction comes from the person with the money, is an investment; borrowing money from a bank to finance the purchase of an automobile, where the impetus for the transaction comes from the person who needs the money, is a loan. In between is a gray area which, in the absence of further congressional indication of intent or Supreme Court construction, has been and must be in the future subjected to case-by-case treatment.

*C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc., supra,* 508 F.2d at 1359.

the federal securities [laws].'"); Sonnenschein, *supra,* at 1581 ("in most cases in which institutional lenders have made federal antifraud claims, [coverage has been] denied").

Application of the commercial-investment dichotomy, however, is inappropriate in the Second Circuit. Rather, determination of whether a note is a security is governed by the test enunciated by Judge Friendly in *Exchange National Bank v. Touche Ross & Co., supra. See Banco Nacional de Costa Rica v. Bremar Holdings Corp.,* 492 F.Supp. 364, 368 (S.D.N.Y.1980); *SEC v. Garfinkle,* [1978] Fed.Sec.L.Rep. (CCH) ¶ 96,465, at 93,-700 (S.D.N.Y.1978); *Altman v. Knight,* 431 F.Supp. 309, 311–12 (S.D.N.Y.1977). In that case, Judge Friendly, after reviewing the decisions that applied the commercial-investment dichotomy, concluded that "the efforts to provide meaningful criteria for decision under 'the commercial-investment' dichotomy do not seem to us to carry much promise of success." *Id.* at 1136.[18] He therefore adopted what has been termed a literalist of neo-literalist approach to the subject of notes as securities. *Union Planters National Bank v. Commercial Credit Business Loans, Inc.,* 651 F.2d 1174, 1180 n. 7 (6th Cir.), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981); Sonnen-

schein, *supra,* at 1602; *see Exchange National Bank v. Touche Ross & Co., supra,* 544 F.2d at 1137 ("the best alternative now available may lie in greater recourse to the statutory language"). In Judge Friendly's words,

[a] party asserting that a note of more than nine months maturity is not within the 1934 Act (or that a note with a maturity of nine months or less is within it) or that any note is not within the anti-fraud provisions of the 1933 Act has the burden of showing that "the context otherwise *requires."* (Emphasis supplied.) One can readily think of many cases where it does—the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized). When a note does not bear a strong family resemblance to these examples and has a maturity exceeding nine months, [sec-

---

**18.** Judge Friendly also noted the concurring opinion in *Great Western Bank & Trust v. Kotz, supra,* in which Judge Wright apparently suggested that the securities laws should not apply when a bank receives a note in the exercise of its lending functions. 544 F.2d at 1136–37. Although finding this approach "rather appealing," *id.* at 1136, Judge Friendly rejected it. He noted that

[o]ne reason [for rejecting Judge Wright's suggestion] is that, in framing his exception, under the influence of the facts in the case in hand which are also present here, he seems to look at the matter solely, or at least principally, from the standpoint of a bank seeking to invoke the federal securities laws as a remedy supplementing those afforded by state laws. However, as shown by several of the cases cited, often it is the borrower who asserts fraud by the lender. Judge Wright's arguments based on a bank's superior bargaining position and its special investigatory

facilities would have little bearing in such a case; indeed the former would weigh in favor of holding the note to be a security. Yet we see nothing in the statutes that would justify holding that the same note was a security when a borrower from a bank invoked federal law and not a security when the bank asserted this. Even when it is the bank that invoked the federal securities laws, we would find it hard to reconcile with the statutory language a holding that where a bank or a group of banks loaned many millions of dollars to a corporation for periods of several years, the antifraud provisions of the federal securities laws do not apply. While banks are in a favored position to obtain disclosure, the target of §§ 10(b) of the 1934 Act and 17(a) of the 1933 Act is fraud, which a bank's ability to obtain disclosure cannot always prevent.

*Id.* at 1137 (footnote omitted).

tion] 10(b) of the 1934 Act should generally be held to apply.

*Id.* at 1137–38 (footnotes omitted).[19]

■■■ Applying Judge Friendly's test to this case, the Court finds that the Note Endorsements are not securities. These notes, which were for a short term and which were secured by Frigitemp's customer notes receivable, bear a strong family resemblance to "short-term notes secured by an assignment of accounts receivable." *Id.* at 1138. The Replacement Notes, on the other hand, bear no resemblance to the examples delineated by Judge Friendly and would presumptively be securities for purposes of section 17(a) of the 1933 Act.[20] Their status under the 1934 Act, however, is not as clear because the notes had a maturity at the time of issuance of less than nine months.

Judge Friendly offered no guidance for determining "the status under the 1934 Act of a note with a maturity of nine months or less that does not bear such a strong family resemblance." *Id.* at 1138 n. 19; *see also Franklin Savings Bank v. Levy,* 551 F.2d 521, 528 n. 11 (2d Cir.1977). Nevertheless, under the circumstances of this case, the Court concludes that the Replacement Notes are securities. Because the notes do not bear a strong family resemblance to the examples delineated by Judge Friendly, they would presumptively be securities for purposes of section 17(a). The Court can perceive no reason for differentiating between section 17(a) and section 10(b) and holding that the notes are securities under one provision, but not the other.[21] *See* Sonnenschein, *supra,* at 1575;[22] *see also Zeller*

19. Andersen argues that this is not the test enunciated by Judge Friendly. It contends that *Exchange National Bank* requires a court to determine whether a note is a security by examining the following criteria: whether the loan transaction was negotiated by the lenders' administrative officers or by lending officials; whether the form of the note was dictated by the lender or the borrower; whether the notes resembled standard forms used in commercial lending; whether the maturity date was fixed or depended on long-term advance notice by the lender; whether the loan was subordinated; whether the notes were transferable and prepayment allowed; whether the loan was secured by after-acquired collateral and set-off rights; and whether the loan was part of a borrower's complex financing operation involving multiple subordinated creditors. *See* Reply Memorandum of Law of Defendant Arthur Andersen & Co. in Support of Motion to Dismiss and for Summary Judgment at 48–56. This is incorrect. In *Exchange National Bank,* Judge Friendly utilized the above factors only to show that the result reached in the case would have been the same had the commercial-investment dichotomy been used. 544 F.2d at 1138 ("If ours is the correct approach, affirmance is clearly demanded—as it doubtless also would be by the 'commercial-investment' dichotomy.")

20. It can be argued that Judge Friendly did not intend the "strong family resemblance test" to apply to § 17(a) because he said that "[w]hen a note does not bear a strong family resemblance to these examples and has a maturity exceeding nine months, § 10(b) of the 1934 Act should generally be held to apply." 544 F.2d at 1138 (footnote omitted). When the passage is read

in context, however, it appears that such a narrow reading is inappropriate.

21. Although the text of *Exchange National Bank* requires the Court to presume that a note is a security under § 17(a) unless the note bears a strong family resemblance to the examples delineated in the opinion, it can be argued that when Judge Friendly "[left] for another day ... the question whether a note which because of its short term would not be a security under § 10(b) of the 1934 Act might be one within the antifraud provisions of the 1933 Act," 544 F.2d at 1138, he implied that the presumption is not appropriate when dealing with short term notes, that is, notes with a maturity of nine months or less. If this argument were correct, a conclusion that the Replacement Notes are securities under § 10(b) because there is no reason for differentiating between § 17(a) and § 10(b) would clearly not be viable. The Court, however, need not determine Judge Friendly's intent, because the conclusion that the Replacement Notes are securities under § 10(b) is not based solely on this rationale; another reason is that the actual effect of the Replacement Notes was to extend the maturity date on the existing unsecured notes from April 30, 1977 until March 31, 1978, a period of eleven months. *See infra.*

22. Sonnenschein concludes that, because the 1933 Act's registration exemption for short-term notes does not apply to the Act's antifraud provisions, "a similar result with respect to the coverage of the antifraud provisions of the 1934 Act [is suggested]. This comports with the differing policies underlying the 1933 Act registration scheme, on the one hand, and

*v. Bogue Electric Manufacturing Corp., supra,* 476 F.2d at 799–800.[23] Moreover, although the Replacement Notes had a maturity of less than nine months when issued on August 9, 1977, their actual effect was to extend the maturity date on the existing unsecured notes from April 30, 1977 until March 31, 1978, a period of eleven months. *See* Note Replacement Agreement, Ross Affidavit Ex. 9, at 1 (the Replacement Notes were issued "to extend the maturity of the Existing Notes"). This makes the Court especially reluctant to conclude that these notes are excluded from the coverage of section 10(b) solely because of their short term.[24]

Andersen's fallback position is that *Exchange National Bank* is no longer controlling precedent because the Supreme Court, in *Marine Bank v. Weaver,* 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982),[25] rejected the literalist approach in favor of one that emphasizes the economic realities of a given transaction. This interpretation has not been accepted in this Circuit. In *Gold-*

*en v. Garafalo,* 678 F.2d 1139 (2d Cir.1982), a case decided after *Weaver,* the Second Circuit concluded that an economic reality analysis is inappropriate in most situations and essentially affirmed the literalist approach to determining whether an instrument is a security within the meaning of the securities laws.[26] It noted that

> [w]e believe that Congress intended to draft an expansive definition [of the term "security"] and to include with specificity all instruments with characteristics agreed upon in the commercial world, such as "debentures," "stock," "treasury stock" or "voting-trust certificates." Catch-all phrases such as "investment contract," were then included to cover unique instruments not easily classified. If the "economic reality" test were to be the core of the definition, only general catch-all terms would have been used.

*   *   *   *   *   *

Our prior cases fully support this view. In *Movielab, Inc. v. Berkey Photo, Inc.,*

---

the antifraud scheme of both Acts, on the other." Sonnenschein, *supra,* at 1575 (footnote omitted).

**23.** The Securities and Exchange Commission has taken the position that the registration exemption of the 1933 Act applies only to "prime quality negotiable commercial paper of a type not ordinarily purchased by the general public, that is, paper issued to facilitate well recognized types of current operational business requirements and of a type eligible for discounting by Federal Reserve banks." Securities Act Release No. 4412, 26 Fed.Reg. 9158, 9159 (1961). In *Zeller v. Bogue Electric Mfg. Corp., supra,* Judge Friendly concluded that "[w]e have no doubt that the Commission would take the same view with respect to the [short term note exemption of the 1934 Act]," and that "the mere fact that a note has a maturity of less than nine months does not take the case out of [section 10(b)], unless the note fits the general notion of 'commercial paper' reflected in the SEC Release." *Id.* at 800. It is unclear how *Exchange National Bank* affects these conclusions. If it has had no effect and if the Replacement Notes do not fit the definition of commercial paper contained in the SEC Release (a question that has not been addressed on this motion), *Zeller* could provide another basis for holding that the notes are not excluded from the coverage of § 10(b) solely because of their short term.

**24.** Because of the conclusion that the Replacement Notes are securities, the Court does not address the status of the Elsters notes.

**25.** In *Weaver,* the plaintiffs pledged a conventional certificate of deposit issued by the defendant, a commercial bank, to the defendant to guarantee a loan made by the defendant to another company. In return for their guarantee, the plaintiffs, pursuant to an agreement with the company's owners, were to receive 50% of the company's profits and $100 per month as long as they guaranteed the loan. They were also given use of the company's barn and pasture and the right to veto future borrowing by the company. 102 S.Ct. at 1222. The deal, however, went sour, and the plaintiffs sued under the antifraud provisions of the securities laws. The Supreme Court held that neither the certificate of deposit nor the agreement were securities. *Id.* at 1223, 1223–25.

**26.** In *Golden,* the Second Circuit rejected the "sale of business doctrine," which provides that "a sale of a business effectuated by a transfer of stock does not involve a 'security' within the meaning of the [securities laws] when the 'economic reality' of the transaction is 'commercial'—acquiring a business to manage—rather than 'investment'—receiving income from capital without managerial effort." 678 F.2d at 1141.

452 F.2d 662 (2d Cir.1971), we held that two 8% installment notes, in the amount of $5,250,000 each, given by Movielab to Berkey and payable over 20 years were "securities" because they were "notes." In "economic reality," the transaction was merely a sale of assets on credit and, therefore, of a commercial, rather than investment, nature. We have reaffirmed *Movielab* in a post-[*United Housing Foundation v.*] *Forman* [421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621] decision. *Exchange National Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1133 (2d Cir.1976). Judge Friendly's opinion in that case noted the "dubious value" of the *Howey* [*SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244] "economic reality" test in the context of determining what kind of "notes" are "securities," *id.* at 1136, and suggested that even in the light of *Forman*, "the best alternative ... may lie in greater recourse to the statutory language." *Id.* at 1137. We agree fully with Judge Friendly that however great the merits of the *Howey* test in determining what falls within the catch-all phrase "investment contract," it is of little help in determining the meaning of more specific words which refer to instruments with commonly agreed upon characteristics, such as "stock."

\*    \*    \*    \*    \*    \*

Congress thus may have had good reason to draft the definition of "security" so as to include all instruments having commonly agreed upon characteristics, such as "stock," leaving "economic reality" to govern only the catch-all phrase "investment contract" in cases involving unusual or unique instruments. The dangers in creating uncertainty as to the scope of the Acts and in generating slippery legal and factual issues going to jurisdiction are substantial. We regard that as having been the legislative judgment, and we give it force. *Id.* at 1144–46.

The clear import of *Golden* is that *Exchange National Bank* is still the law in this circuit. Thus, although there may well be merit to the commercial-investment dichotomy, the Court is bound to follow Judge Friendly's literalist approach and hold that the Replacement Notes are securities and that there is jurisdiction to hear the Banks' claims under the securities laws.

### B.   *The Pledge of Elsters Stock*

Whether the pledge of Elsters stock is sufficient to support the exercise of jurisdiction is also an interesting issue. To resolve it, two questions must be answered: first, whether the pledge of Elsters stock was a sale within the meaning of the securities laws; second, whether the alleged fraud occurred "in connection with" the pledge.

■ The answer to the first question is clear: a pledge of stock is equivalent to a sale for purposes of section 17(a) of the 1933 Act, *Rubin v. United States*, 449 U.S. 424, 431, 101 S.Ct. 698, 702, 66 L.Ed.2d 633 (1981); *United States v. Gentile*, 530 F.2d 461, 466–67 (2d Cir.), *cert. denied*, 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976), and section 10(b) of the 1934 Act, *Mallis v. Federal Deposit Insurance Corp.*, 568 F.2d 824, 828–30 (2d Cir.1977), *cert. dismissed*, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978); *see Marine Bank v. Weaver, supra*, 102 S.Ct. at 1222 n. 2 (Supreme Court implied that its holding in *Rubin* was applicable to section 10(b)).[27] The question that

---

**27.** The 1933 Act defines the term sale to include "every contract of sale or disposition of a security or interest in a security, for value," and defines the term offer to include "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." 1933 Act § 2(3), 15 U.S.C. § 77b(3) (1976). In *Rubin*, the Supreme Court held that this definition encompassed a pledge because "[o]btaining a loan secured by a pledge of shares of stock unmistakably involves a 'disposition of [an] interest in a security, for value.' Although pledges transfer less than absolute title, the interest thus transferred nonetheless is an 'interest in a security.'" 449 U.S. at 429, 101 S.Ct. at 701. The *Rubin* Court also found that, from a policy standpoint, there was no reason to distinguish between a pledgee and a purchaser of stock because, when a pledgee makes a loan and accepts a pledge of stock as

has been debated by the parties is whether the alleged fraud occurred "in connection with" the pledge of Elsters stock. Andersen argues that, because there was no misrepresentation or omission concerning the value of Elsters stock or Elsters' financial condition, the pledge of Elsters stock cannot be used to sustain jurisdiction under section 10(b). The Banks argue that, to sustain jurisdiction under section 10(b), the fraud must merely "touch upon" the sale, not relate to the value of the pledged securities. According to the Banks, this requirement has been satisfied. The Court agrees with the Banks.

The seminal case on the "in connection with" requirement is *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). The facts of *Superintendent of Insurance* can be summarized as follows. As part of a scheme to take control of the Manhattan Casualty Company, several defendants induced Manhattan's Board of Directors to sell its United States Treasury Bonds for approximately $5 million. The defendants, however, misappropriated the money and used it to purchase all of Manhattan's stock. Manhattan, through New York's Superintendent of Insurance, sued for violations of section 10(b) and section 17(a). The District Court dismissed the complaint, and the Second Circuit affirmed, holding, *inter alia,* that there was no fraud "in connection with" the sale of the Treasury Bonds. The Second Circuit noted that

> [w]hat distinguishes the fraud perpetrated on Manhattan in this case from one cognizable under Rule 10b–5 is that its sole object was to obtain possession of Manhattan's government bonds for the personal use of the perpetrators. No doubt the deception was successful, for had the board known that Sweeny and his associates intended to misappropriate the proceeds for their own use it undoubtedly would not have authorized their sale. But that deception did not infect the subsequent sales transaction. With respect to the terms of the sale itself neither the purchaser nor the seller of the bonds was deceived or defrauded. Indeed, it is no part of the liquidator's claim that the full and fair market price was not paid for those bonds by their purchaser. The fraud which harmed the plaintiff consisted of the failure of Sweeny and his associates to account for the proceeds. There is a structural difference between the sale of the corporation's bonds at a concededly fair price and the subsequent fraudulent misappropriation of the proceeds received.

*Superintendent of Insurance v. Bankers Life & Casualty Co.,* 430 F.2d 355, 360 (2d Cir.1970) (citations omitted). The Supreme Court reversed, holding that the fraud was "in connection with" the sale of the Treasury Bonds. 404 U.S. at 12, 92 S.Ct. at 168. Writing for a unanimous Court, Justice Douglas noted that "[s]ection 10(b) must be read flexibly, not technically and restrictively." *Id.* Because "Manhattan suffered an injury as a result of deceptive practices touching its sale of securities," it had a cause of action under the securities laws. *Id.* at 12–13, 92 S.Ct. at 168–169.

*Superintendent of Insurance* and its progeny require a nexus, albeit not a direct or close relationship, between the allegedly fraudulent conduct and the sale of securities. *Brown v. Ivie,* 661 F.2d 62, 65 (5th Cir.1981), *cert. denied,* 455 U.S. 990, 102 S.Ct. 1614, 71 L.Ed.2d 850 (1982); *Ketchum v. Green,* 557 F.2d 1022, 1028 (3d Cir.), *cert. denied,* 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977). Stated otherwise, the fraudulent conduct must "touch upon" the securities transaction. *United States v.*

---

security, he is taking an investment risk identical to the risk taken by investors who purchase shares of stock. *Id.* at 431, 101 S.Ct. at 702; *accord, United States v. Gentile, supra,* 530 F.2d at 466–67.

The same result was reached by the Second Circuit in the context of section 10(b). In *Mallis v. Federal Deposit Insurance Corp., supra,* the Second Circuit noted that the rationale underlying the *Gentile* decision—that there is no reason to distinguish between a pledgee and a purchaser of stock because the investment risks are identical—"is persuasive authority for holding that a pledge constitutes [a sale under the 1934 Act]." 568 F.2d at 830.

*Newman,* 664 F.2d 12, 18 (2d Cir.1981); *Brown v. Ivie, supra,* 661 F.2d at 65; *Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1028 (6th Cir.1979); *Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath,* 516 F.2d 811, 815 (2d Cir.1975); *see Superintendent of Insurance v. Bankers Life & Casualty Co., supra,* 404 U.S. at 12–13, 92 S.Ct. at 168–169. This has been called the "'de minimis touch test,'" *Mansbach v. Prescott, Ball & Turben, supra,* 598 F.2d at 1028 (quoting Note, *The Pendulum Swings Farther: The "In Connection With" Requirement and Pretrial Dismissals of Rule 10b–5 Private Claims for Damages,* 56 Tex.L.Rev. 62, 66 (1977)), primarily because it does not take much of a "touch" to satisfy the test. *See* 1 A. Bromberg & L. Lowenfels, Securities Fraud and Commodity Fraud § 4.7(574)(3), at 88.34 (1979) (only a "very tenuous" connection need be shown). Indeed, one commentator has noted that

> [t]he "in connection with" clause would ordinarily be fulfilled if a securities transaction is involved in some way, even though the fraud did not occur in the purchase or sale that is attacked (assuming the fraud and securities transaction can be integrated into the same scheme), the deceit did not concern the terms of the securities transaction, the claimant was not a party to the deceptive transaction, the fraud and the loss were merely indirectly connected, the securities transaction was only tangentially related to the fraudulent course of conduct, and the fraud was not aimed at causing a purchase or sale of a security.

5 A. Jacobs, Litigation and Practice Under Rule 10b–5, § 38.01[b], at 2–43 to 2–44 (2d ed. 1981). The practical result of this broad test has been that, since *Superintendent of Insurance,* few courts have found the relationship between the fraud and the sale to be too attenuated or remote to support a claim under section 10(b). *Mansbach v. Prescott, Ball & Turben, supra,* 598 F.2d at 1028.

The Second Circuit has consistently adhered to the teachings of *Superintendent of Insurance, United States v. Newman, supra,* 664 F.2d at 18, and, like other courts, has liberally construed the "in connection with" requirement. *Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath, supra,* is a good example. In that case, the plaintiff lost several million dollars on securities transactions made by one Yamada in his capacity as the plaintiff's investment adviser. To recoup some of its losses, the plaintiff sued the defendant accounting firm under section 10(b), alleging that the firm misrepresented the financial condition of Takara Partners, an investment fund managed by Yamada, to induce the plaintiff to retain Yamada and his company to manage part of its portfolio. There was no allegation that the defendant misstated the financial condition of the companies whose securities were traded. The Second Circuit held that the allegations in the complaint were sufficient to meet the "in connection with" requirement because the "[p]laintiff . . . alleged a fraudulent scheme the accomplishment of which is directly related to the trading process." *Id.* at 815; *see United States v. Newman, supra,* 664 F.2d at 18.

Andersen's argument that the fraud must relate to the value of the securities finds no support in the case law. The argument appears to be premised on language in *Rubin* and *Gentile* concerning the identical investment risks taken by a pledgee and a purchaser of stock. *See Rubin v. United States, supra,* 449 U.S. at 431, 101 S.Ct. at 702; *United States v. Gentile, supra,* 530 F.2d at 467. For example, Andersen points to the Supreme Court's statement that "[b]oth [a pledgee and a purchaser of stock] are relying on the value of the securities themselves, and both must be able to depend on the representations made by the transferor of the securities," 449 U.S. at 431, 101 S.Ct. at 702; argues that, "when the Supreme Court referred to 'the representations made by the transferor of the securities,' it meant representations as to the *securities* transferred, and not representations as to the transferor," Memorandum of Law of Defendant Arthur Andersen &

Co. in Support of Motion to Dismiss and for Summary Judgment at 30; and concludes that the Supreme Court made clear that the borrower in a pledge transaction (and presumably the seller in an outright sale of a security) can be liable under the securities laws only if he fails to disclose accurate information about the pledged securities. The problem with Andersen's argument, however, is that the passages relied upon have been taken out of context. The discussion in *Rubin,* and the similar discussion in *Gentile,* concerned only whether a pledge of stock was a sale. Both courts were simply saying that, because the investment risk taken by a pledgee is identical to the investment risk taken by a purchaser of shares of stock, there is no reason to treat a pledge differently than an outright sale of stock for purposes of the antifraud provisions of the securities laws. If more was intended, it was not indicated.

Perhaps the Supreme Court will, when confronted with the issue, narrow the test for determining whether the "in connection with" requirement has been satisfied since there are undoubtedly many instances in which the liberal interpretation of the requirement allows use of the securities laws in what are merely state law commercial disputes.[28] Until it does, however, the Court must adhere to Supreme Court and Second Circuit precedent and utilize the broad touch test. *See Kaufman and Broad, Inc. v. Belzberg,* 522 F.Supp. 35, 41 (S.D.N. Y.1981) ("This Court has neither the inclination nor the effrontery to ignore or defy the applicable rulings of the Court of Appeals in this Circuit.").

▮ Application of the "touch test" to the facts of this case[29] leads to the conclusion that the "in connection with" requirement of section 10(b) has been satisfied. The Banks, in their complaint and supporting affidavit, allege that the pledge of Elsters stock was inextricably entwined with the other parts of the August 1977 transaction. More importantly, they allege that, in deciding whether to advance the money to Elsters, Frigitemp's wholly owned subsidiary, and accept Frigitemp's guarantee and pledge of Elsters stock, they relied on the financial statements prepared and certified by Andersen and that, but for the presentation of Frigitemp as a financially healthy company, they would not have accepted Frigitemp's guarantee and pledge of Elsters stock. Unquestionably, the Banks do not allege that there were any misrepresentations concerning the value of Elsters stock. In view of the breadth of the "touch test" and in view of the Banks' allegation that they would not have entered into the transaction if the truth about Frigitemp were known, however, the Court cannot say, as a matter of law, that the alleged fraud did not "touch upon" the pledge of Elsters stock. Thus, the Court holds that the pledge is sufficient to sustain jurisdiction

28. In *Rubin v. United States, supra,* the Supreme Court noted the question "whether misrepresentations or omissions involved in a securities transaction but not pertaining to the securities themselves can form the basis of a violation of § 17(a) [of the 1933 Act]," but did not decide it and did not give any indication of how it would be decided. *Id.* at 429 n. 6, 101 S.Ct. at 701 n. 6. This Court need not decide it either. The Banks have alleged that Andersen's conduct violated both § 10(b) of the 1934 Act and § 17(a) of the 1933 Act. In light of our conclusion that the "in connection with" requirement of § 10(b) has been satisfied, there is little practical point in deciding whether the pledge of Elsters stock also supports the exercise of jurisdiction under § 17(a). The Court is especially reluctant to do so because there appear to be few, if any, cases dealing directly with the question of how close a connection between the alleged fraud and the security transaction is necessary under § 17(a). It should be noted, however, that the language of § 17(a) may require a closer nexus than that required under § 10(b)—§ 17(a) proscribes fraud "in the offer or sale of [a security];" § 10(b) proscribes fraud "in connection with the purchase or sale of [a security]." Thus, it is conceivable that the Supreme Court could require that the fraud relate to the securities themselves in the context of § 17(a), but not in the context of § 10(b).

29. Interestingly, Andersen does not argue that the "touch test" was not satisfied in this case. It simply asserts that there can be no violation of the securities laws if the alleged fraud did not directly relate to the value of the securities.

over the transactions at issue.[30] *See Weaver v. Marine Bank,* 637 F.2d 157, 163 (3d Cir.1980) (on analogous facts, the Third Circuit held that the "in connection with" requirement was satisfied), *rev'd on other grounds,* 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982).[31]

## II. *Legal Sufficiency of the Complaints*

The second part of Andersen's motion raises the question whether the Banks' first and fourth claims—that Andersen violated the securities laws and that it aided and abetted violations of the securities laws—are legally sufficient.

### A. *Primary Liability*

Andersen makes three arguments concerning primary liability. Initially, it argues that, as a matter of law, an independent outside auditor cannot be liable as a primary violator of section 10(b) of the 1934 Act; according to Andersen, it can at most be charged as an aider and abettor of a securities law violation. Second, Andersen argues that the complaint must be dismissed because it merely tracks the language of section 10(b). Finally, Andersen argues that the allegations of the complaint amount only to a claim of negligence and that, therefore, Andersen's scienter has not

been adequately pleaded. None of these arguments warrants dismissal of the complaint.

■ Andersen's initial argument is incorrect. There is no reason why an accounting firm that engages in allegedly fraudulent conduct in violation of the securities laws cannot be held liable for those violations. As one court explained,

[c]ommonly, in securities fraud actions, a distinction has been drawn between primary and secondary defendants. Those persons or entities owing direct duties to the public are classified as primary wrongdoers and those whose liabilities arise because another has violated the law are classified as secondary wrongdoers.

Accountants may be primary wrongdoers when they [prepare and certify financial statements that] contain misrepresentations or omit to state facts necessary to make what is said not misleading [because] [f]inancial statements certified by an accountant for presentation to investors give rise to a direct duty to the public.

*Seiffer v. Topsy's International, Inc.,* 487 F.Supp. 653, 667 (D.Kan.1980) (citation omitted); *accord, McLean v. Alexander,* 599 F.2d 1190, 1195–99 (3d Cir.1979) (although

**30.** Although the August 1977 transaction can be divided into several parts, it really should be viewed as one integrated transaction. Thus, the Court believes that either the notes or the shares pledged to the Banks are sufficient to support the exercise of jurisdiction over the entire transaction. *See Bolton v. Gramlich,* 540 F.Supp. 822, 840 (S.D.N.Y.1982).

**31.** As noted above, *see supra* note 25, the plaintiffs in *Weaver* pledged a conventional certificate of deposit issued by the defendant, a commercial bank, to the defendant to guarantee a loan made by the defendant to another company. Shortly thereafter, the company went bankrupt and could not repay the loan to the bank. The plaintiff sued the bank under § 10(b), alleging that "Bank officers told them [the company] would use the . . . loan as working capital but instead it was immediately applied to pay [the company's] overdue obligations." 102 S.Ct. at 1222. The Third Circuit held, *inter alia,* that the alleged fraud was "in connection with" the pledge of the certificate of deposit, a security according to the Third Cir-

cuit, even though the fraud did not relate to the value of the certificate of deposit. 637 F.2d at 163. Although the Supreme Court reversed the Third Circuit's holding that the certificate of deposit was a security, 102 S.Ct. at 1223, it did not address the question whether the alleged fraud was "in connection with" the pledge or give any indication that the Third Circuit's conclusion may have been incorrect. Indeed, it could be argued that the Supreme Court implicitly approved of the result when it said that

"[t]he Court of Appeals also concluded that the pledge of a security is a sale, an issue on which the federal circuits were split. We held in [*Rubin*] that a pledge of stock is equivalent to a sale for the purposes of the antifraud provisions of the federal securities laws. Accordingly, in determining whether fraud may have occurred here 'in connection with the purchase or sale of any security,' the only issue now before the Court is whether a security was involved."

*Id.* at 1222 n. 2.

the court held that the requisite scienter was not present, it assumed that an accountant could be liable as a primary violator); *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 540 F.2d 27, 28–38 (2d Cir.1976) (court upheld judgment against accountants as primary violators of section 10(b)); *Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath, supra,* 516 F.2d at 812–15 (section 10(b) action against accountants for preparing false and misleading financial statements allowed to proceed to trial).

The four cases cited by Andersen do not compel a contrary conclusion. Three cases, *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.,* 602 F.2d 478 (2d Cir.1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980), *Lanza v. Drexel & Co.,* 479 F.2d 1277 (2d Cir.1973) (en banc), and *Savino v. E.F. Hutton & Co.,* 507 F.Supp. 1225 (S.D.N.Y.1981), stand only for the proposition that, if one does not engage in "independent fraudulent conduct on which liability could be hinged, [he] may not be held liable as [a] principal." *Id.* at 1241; *see* 602 F.2d at 483; 479 F.2d at 1289. In the fourth case, *Fischer v. Kletz,* 266 F.Supp. 180 (S.D.N.Y.1967), Judge Tyler merely wrote that defendants in securities fraud cases tend "to fall into four general categories[:] . . . insiders, . . . broker dealers, . . . corporations whose stock is purchased or sold by plaintiffs[,] . . . [and aiders and abettors of] . . . a party who falls into one of the first three [categories]." *Id.* at 190. Judge Tyler did not say that an accountant could not be liable for fraudulent misrepresentations in a financial statement he prepared and certified.

■ Andersen's second argument is equally unavailing. Admittedly, the first claim in the complaint does track the language of section 17(a) and section 10(b). The MHT complaint, for example, alleges that Andersen

employed devices, schemes and artifices to defraud; . . . made untrue statements of material facts, in the Statements and elsewhere, or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and . . . engaged in acts, practices, and courses of conduct and business which operated or would operate as a fraud or deceit.

MHT Complaint ¶ 27. If that were all that was alleged, Andersen would be correct in asserting that a claim for primary liability is not stated. *See Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 (2d Cir.1979) ("It will not do merely to track the language of Rule 10b–5 and rely on such meaningless phrases as 'scheme and conspiracy' or 'plan and scheme and course of conduct to deceive.' "), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). The first claim, however, also incorporates by reference approximately eleven pages of allegations that state with particularity the basis of Andersen's alleged liability under the securities laws. *E.g.,* MHT Complaint ¶¶ 4–25. Inclusion of these allegations in the first claim makes frivolous any argument that the complaint merely tracks the language of section 10(b).

■ Turning to the scienter argument, the Court notes that Andersen is correct in pointing out that it cannot be liable under section 10(b) for mere negligence. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1380, 47 L.Ed.2d 668 (1976); *see Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 472, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480 (1977). "[A] private cause of action for damages will [not] lie under [section 10(b)] in the absence of any allegations of 'scienter,' " *Ernst & Ernst v. Hochfelder, supra,* 425 U.S. at 193, 96 S.Ct. at 1380, which, in this circuit, means intent or recklessness.[32] *IIT, An International Investment Trust v.*

32. The Supreme Court has not resolved the question whether recklessness suffices for civil liability under section 10(b). *Ernst & Ernst v. Hochfelder, supra,* 425 U.S. at 193 n. 12, 96 S.Ct. at 1381 n. 12 ("We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under [section 10(b)]."); *see Sante Fe Industries, Inc. v. Green, supra,* 430 U.S. at 472, 97 S.Ct. at 1300 (Hochfelder held that "a cause of action under [section 10(b)] does not lie for mere negligence.").

*Cornfeld,* 619 F.2d 909, 923 (2d Cir.1980) ("reckless conduct will generally satisfy the *scienter* requirement"); *accord, Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 575 (2d Cir.1982).

Andersen is incorrect, however, in arguing that the allegations of the complaint amount only to a claim of negligence. The complaint alleges that Andersen knew that financial information contained in the financial statements was materially false and misleading or was so reckless in preparing and certifying the statements that its conduct was tantamount to wilfullness. If the Banks prove either of these allegations—knowledge or recklessness—at trial,[33] they will have satisfied the scienter requirement as it has been interpreted in this Circuit.[34] Thus, they have alleged scienter sufficiently to state a claim against Andersen as a primary violator of section 10(b), and it would be improvident to conclude at this juncture that there is no set of facts that would entitle the Banks to relief under section 10(b). *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957) ("complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief" (footnote omitted)).[35]

## B. *Aiding and Abetting Liability*

Andersen makes two arguments concerning the Banks' allegations of aiding and abetting liability: the first is that there is no aiding and abetting liability under the antifraud provisions of the securities laws; the second is that the complaint does not adequately plead Andersen's scienter. Neither argument has merit.

A cause of action for aiding and abetting a violation of the antifraud provisions of the securities laws has been recognized in the Second Circuit for many years.[36] *See Sirota v. Solitron Devices, Inc., supra,* 673 F.2d at 575; *IIT, An International Investment Trust v. Cornfeld, supra,* 619 F.2d at 922; *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47–48 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). If one knowingly renders substantial assistance "in the achievement [of a] primary violation [of the securi-

---

**33.** The complaints allege that Andersen "knew or should have known" that the financial statements were false and misleading and that Andersen acted in a "grossly negligent and reckless manner" in preparing the statements. If, at trial, the Banks prove only that Andersen "should have known" that the statements were false and misleading or that Andersen was grossly negligent, but not reckless, in preparing the statements, it would not prevail. As a matter of pleading, however, allegations in the disjunctive, when one of the alternatives is legally sufficient, is permissible. *See IIT, An International Investment Trust v. Cornfeld, supra,* 619 F.2d at 924.

**34.** Andersen mistakenly relies on *Dworman v. Lee,* 83 A.D.2d 507, 441 N.Y.S.2d 90 (1st Dep't 1981), *aff'd,* 56 N.Y.2d 816, 438 N.E.2d 103, 452 N.Y.S.2d 570 (1982), a recent New York case in which the Appellate Division held that a complaint similar to the Banks' complaint did not state a cause of action for fraud. *Id.* at 507, 441 N.Y.S.2d at 91 ("Notwithstanding the nomenclature of the first and second causes sounding in fraud and the language in the third cause of action that defendants 'knew or should have known the falsity of their representations,' we find that the first, second and third causes essentially plead negligence.").

Whatever effects *Dworman* may have on this Court's consideration of the state common law claims, it governs neither the pleading requirements of the Federal Rules of Civil Procedure nor the substantive elements of a cause of action under section 10(b).

**35.** Andersen also argues that § 17(a) of the 1933 Act is inapplicable to independent outside auditors. The Court need not, however, address this issue. The Banks have alleged that Andersen's conduct violated both § 10(b) of the 1934 Act and § 17(a) of the 1933 Act. As we have already ruled that the Banks have stated a claim under § 10(b), there is little practical point in assessing the merits of Andersen's § 17(a) argument. If necessary, it will be considered at a later juncture.

**36.** Although, to use Andersen's words, "the Supreme Court ... may well hold that there is no aiding and abetting liability under the [anti]fraud provisions of the ... securities laws," Reply Memorandum of Law of Defendant Arthur Andersen & Co. in Support of Motion to Dismiss and for Summary Judgment at 103, it has not yet done so. Until it does, this Court must follow Second Circuit precedent.

ties laws]," he can be liable as an aider and abettor. *IIT, An International Investment Trust v. Cornfeld, supra,* 619 F.2d at 922.[37] The only issue on this motion, therefore, is whether the scienter element has been pleaded adequately.[38]

■ Although the degree of scienter necessary to establish a primary violation of section 10(b) is fairly well established in this circuit, *see Sirota v. Solitron Devices, Inc., supra,* 673 F.2d at 575; *IIT, An International Investment Trust v. Cornfeld, supra,* 619 F.2d at 923, the degree of scienter necessary to establish aiding and abetting liability is an open question. Actual knowledge, of course, will satisfy the requirement. *See id.* at 923–24. Moreover, recklessness is sufficient when "the alleged aider and abettor owes a fiduciary duty to the defrauded party." *Rolf v. Blyth, Eastman Dillon & Co., supra,* 570 F.2d at 44 (footnote omitted); *see Sirota v. Solitron Devices, Inc., supra,* 673 F.2d at 575; *IIT, An International Investment Trust v. Cornfeld, supra,* 619 F.2d at 923. Whether recklessness is sufficient in the absence of a fiduciary duty, however, has not been resolved.[39] *Sirota v. Solitron Devices, Inc., supra,* 673 F.2d at 575.

■ Be that as it may, the parameters of the scienter element need not be determined in this case because the Banks allege more than recklessness. In the fourth claim, the Banks allege that "all of the defendants other than Andersen intentionally, wilfully and fraudulently misrepresen-

ted to plaintiffs the true and accurate state of the finances of Frigitemp," MHT Complaint ¶ 36, and that "Andersen, through its gross negligence and reckless disregard for the accuracy of its statements and opinions concerning the finances of Frigitemp, aided and abetted [these] intentional, wilful and fraudulent misrepresentations." *Id.* ¶ 37. Additionally, the fourth claim, like the first, incorporates by reference approximately eleven pages of allegations that state with particularity the basis of Andersen's alleged liability under the securities laws. Thus, we must read the fourth claim to allege that Andersen, in addition to being reckless, knew or should have known of the misrepresentations in the financial statements and that it knew or should have known that the statements would be relied upon by the Banks.[40] This is sufficient to survive a motion to dismiss. *See IIT, An International Investment Trust v. Cornfeld, supra,* 619 F.2d at 923–24 (allegations that the defendants "aided and abetted and joined in the conspiracy by circulating a prospectus which they knew, or should have known, contained material misrepresentations of facts and material omissions" were sufficient as a "matter of pleading."). Whether the Banks can indeed prove such knowledge will have to await trial.

*Conclusion*

Although the Court believes that the present state of the law in this circuit pre-

---

**37.** In *IIT,* the Second Circuit delineated three prerequisites to a finding of aiding and abetting liability:

(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party;

(2) "knowledge" of this violation on the part of the aider and abettor; and

(3) "substantial assistance" by the aider and abettor in the achievement of the primary violation.

619 F.2d at 922.

**38.** In its reply papers, Andersen asserts that it did not render substantial assistance to the alleged primary violators. This, however, is a factual issue that must be resolved at trial.

**39.** At least two judges in this district, however, have held that "recklessness is sufficient to establish scienter [when] ... an accountant

has reason to foresee that his audit or opinion letter will be relied upon by third parties." *Oleck v. Fischer,* [1979] Fed.Sec.L.Rep. (CCH) ¶ 96,898, at 95,699 (S.D.N.Y.1979), *aff'd,* 623 F.2d 791 (2d Cir.1980); *accord, In re Investors Funding Corporation Securities Litigation,* 523 F.Supp. 550, 558 (S.D.N.Y.1980); *see Sirota v. Solitron Devices, Inc., supra,* 673 F.2d at 575 (noting *Oleck* and *Investors Funding*); *see also IIT, An International Investment Trust v. Cornfeld, supra,* 619 F.2d at 924–25.

**40.** As noted above, the allegation "knew or should have known" is sufficient as a matter of pleading. *IIT, An International Investment Trust v. Cornfeld, supra,* 619 F.2d at 924; *see supra* note 33.

**458**

cludes dismissal of the Banks' claims under the securities laws, it recognizes that there is substantial ground for difference of opinion on the jurisdictional questions—whether the Replacement Notes are securities and whether the pledge of Elsters stock is sufficient to support jurisdiction over this lawsuit. Because these are controlling legal questions, it appears that an immediate appeal from this decision will materially advance the ultimate termination of this litigation. Consequently, the Court will certify an interlocutory appeal on the jurisdictional questions pursuant to 28 U.S.C. § 1292(b) (1976), and will stay further proceedings pending the outcome of the appeal.

SO ORDERED.